LIVINGSTON et al., Appellants,

v.

DIOCESE OF CLEVELAND, Appellee.

[Cite as *Livingston v. Diocese of Cleveland* (1998), 126 Ohio App.3d 299.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 72137.

Decided Feb. 17, 1998.

*William M. Crosby, Nancy A. Kelly* and *Jeffrey R. Anderson,* for appellants.

*Edward J. Maher; Quandt, Giffels & Buck, Beth Sebaugh* and *Nita Kay Smith,* for appellee.

---

Rocco, Judge.

The eight plaintiffs-appellants in this action, all of whom are adult women who allege they were sexually abused as children by a parish priest, appeal from the trial court opinion and order that granted the separate motions for summary judgment filed by defendant-appellee, the Diocese of Cleveland, thus terminating appellants' action. The trial court determined all of appellants' claims were time-barred.

Appellants argue material issues of fact remain concerning the following: (1) the applicability of the doctrine of equitable estoppel to appellee's statute-of-limitations defense, and (2) whether the application of the statute of limitations was tolled in this case either by appellants' "delayed discovery" of their injuries or their mental "disabilities." This court finds the trial court's order was appropriate and therefore affirms its judgment.

The record reflects that the appellants lived in the city of Avon Lake, Ohio as children. During the relevant time period, which encompassed the years from approximately 1954 until 1966, the appellants were either parishioners, neighbors or acquaintances of Father Carl Wernet. Father Wernet was the pastor of St. Joseph's Catholic Church and Elementary School, which are located in that city and are under the jurisdiction of appellee.

On September 3, 1993, appellants filed a six-count complaint against appellee in the Cuyahoga County Court of Common Pleas. Appellants alleged they had been "sexually abused, molested, raped, assaulted and/or battered" by Father Wernet between "1955 and 1965."[1] Appellants alleged appellee was responsible for Father Wernet's acts based upon *respondeat superior.* Appellants further alleged negligence, negligent and intentional infliction of emotional distress, and breach of fiduciary duty against appellee.

Appellee's answer denied the pertinent allegations of the complaint and raised the defense that all of the appellants' claims were barred pursuant to the applicable statute of limitations. Thereafter, the parties pursued discovery in the action.

On July 19, 1995, appellee filed separate motions for summary judgment as to each of the appellants.[2] Each motion was supported by a brief and evidentiary materials. In each brief, appellee asserted that the evidence proved that appellant's claim was barred by the applicable statute of limitations since every appellant admitted she had been aware of the injury more than two years prior to the filing of the complaint.

Appellee attached to each motion copies of the following: (1) a certificate of death demonstrating that Father Wernet had died in 1980, (2) the particular appellant's deposition testimony, and, (3) if applicable, the psychological evaluation done by Dr. Deborah Koricke, a clinical psychologist, at appellants' counsel's request.

On October 16, 1995, appellants filed a single brief in opposition to appellee's motions for summary judgment. Therein, appellants argued material issues of fact remained concerning whether their claims were time-barred. Appellants

---

1. The complaint named two plaintiffs, *viz.,* Laura Livingston and Linda Rae Lotko–Toth; the remainder of the plaintiffs were designated as "Jane Doe" I through V. Subsequently, on August 1, 1994, appellants filed an amended complaint, which named as another plaintiff Mary V. Lewis. The allegations of the amended complaint were same as those of the original.

2. Appellee requested of the trial court that each motion be filed under seal since the supporting documents contained discovery material which presented "sensitive information" regarding the appellant's "personal, family and psychological history." The trial court granted appellee's request.

asserted the following in support of their argument: (1) appellee "induced" them to be silent about the abuse perpetrated upon them, (2) appellee fraudulently "concealed" relevant evidence of Father Wernet's "crimes," (3) appellants were "delayed" in their discovery of their causes of action, and (4) appellants were "disabled" pursuant to R.C 2305.16.

Appellants attached to their brief the following evidentiary materials: (1) the affidavits of each appellant without anonymity, (2) a transcript labeled "affidavit" testimony by Antone F. Feo, a clinical psychologist, (3) a transcript labeled "affidavit" tesimony by Deborah A. Koricke, a clinical psychologist, (4) appellant Toth's psychological medical records, (5) copies of newspaper articles and letters, (6) originals of letters addressed to appellant Toth, (7) portions of deposition testimony of Bishop Alexander T. Quinn, (8) a copy of deposition testimony of Father Urban A. Reichlin, (9) a copy of appellee's responses to appellants' requests for admissions, (10) copies of portions of books and other treatises, and (11) copies of police complaint reports.[3]

On December 5, 1995, appellee filed a reply brief that was supported only by case law.

On February 6, 1996, the trial court issued its opinion and order granting all of appellee's motions for summary judgment as to appellants' claims. The trial court stated that appellants' claims had been brought well outside the limitations periods set forth in R.C. 2305.111, 2305.10 and 2305.16. The trial court further found that appellants could prove neither "delayed discovery" of their claims nor that their mental states had precluded them from filing their action earlier.

Appellants have filed a timely appeal from the trial court's order, presenting four assignments of error for this court's review.[4] Appellants' assignments of error will be addressed in logical order and combined when appropriate.

Appellants' fourth and second assignments of error follow:

"The trial court erred in granting defendant's motion for summary judgment on the plaintiffs' claims in light of evidence in the record that the individual

---

3. Appellee filed a motion to strike certain items attached to appellants' brief as being inadmissable evidence for purposes of Civ .R. 56(C). The record fails to reflect that the trial court ruled on appellee's motion to strike prior to issuing its opinion and order granting summary judgment to appellee on appellants' claims. Nevertheless, since this court presumes regularity in the proceedings below and conducts a *de novo* review of the trial court's order, no prejudice results from the trial court's failure to rule on appellee's motion to strike.

4. Although this court has permitted appellee to file its appellate brief under seal in order to protect appellants' privilege of confidentiality, neither appellants' initial appellate brief nor their reply brief was filed under seal. Under these circumstances, this court deems any confidentiality concerns have been waived by appellants.

plaintiffs were delayed in discovery and then [*sic*] individual memories were not 'verifiable' until one of their number came forward.

"The trial court erred in granting defendant's motion for summary judgment on plaintiff Mary Lewis' claims because a genuine issue of material fact exists about whether the 'discovery rule' operated to toll the statute of limitations."

Appellants argue in these assignments of error that summary judgment for appellee was improper because the evidence before the trial court was sufficient to raise questions of fact concerning whether the statutes of limitation that applied to their action were tolled by the "discovery rule."

The Ohio Supreme Court determined in *Doe v. First United Methodist Church* (1994), 68 Ohio St.3d 531, 537, 629 N.E.2d 402, 407–408, that with respect to a cause of action premised upon acts of sexual abuse, R.C. 2305.111 applies; therefore, the action must be commenced within one year after the cause of action accrues. The Supreme Court also determined that claims of negligence for "failing to protect" a child victim from "sexual behavior" are subject to R.C. 2305.10, *i.e.*, a two-year statute of limitations. *Id.* However, pursuant to R.C. 2305.16, neither statute is triggered until the child victim reaches the age of eighteen.

Subsequently, in the context of a Civ.R. 12(B)(6) dismissal of a victim's complaint on statute-of-limitations grounds, the Ohio Supreme Court declared the "discovery rule" applicable to sexual abuse cases. *Ault v. Jasko* (1994), 70 Ohio St.3d 114, 637 N.E.2d 870. The court indicated the rule applies only "where the victim of childhood sexual abuse *represses* memories of that abuse until a later time"; the Supreme Court reiterated that the statute of limitations "begins to run when the victim *recalls* or otherwise discovers *that he or she was sexually abused,* or when, through the exercise of reasonable diligence, the victim *should* have discovered the sexual abuse." (Emphasis added.) *Id.* at 117–118, 637 N.E.2d at 873.

■ In this case, appellee filed evidentiary materials that demonstrated that all of the appellants continuously were both aware of the harmfulness or inappropriateness of the priest's acts from childhood and also suffered from this awareness; therefore, no memories were repressed and the discovery rule did not apply. *Doe v. First United Methodist Church, supra.*

Appellant Laura Livingston stated in her deposition as follows:

"Q. If I were to tell you that the report from Dr. Koricke indicates and I'm quoting, 'she states that she had *always remembered the incidents,*' does that refresh your recollection?

"A. Hum—

"* * *

"A. What I can tell you, I don't specifically remember saying that but I'm thinking in my mind, what I'm saying is I'm not—how do I put this, I *didn't completely have no recollection* of all these incidents.

"Q. But you remember that they occurred.

"A. Yes.

"* * *

"Q. You always knew it was Father Wernet who was involved.

"A. Yes, I just didn't recall all the *details* of every incident.

"Q. But *you remember there had been abuse* by Father Wernet.

"A. *Yes.*

"Q. So *you always knew that Father Wernet had done something to you—*

"A. *Yes.*

"Q. And you knew that the *kinds of things that he had done were wrong,* did you not?

"A. *Yes.*

"* * *

"Q. And you didn't always recall each of the incidents, did you?

"A. Correct.

"Q. But you did know that things had happened on more than one occasion between you and Father Wernet.

"A. Yes.

"Q. And you *didn't always remember each thing that happened* each time, correct?

"A. That is *correct.*

"Q. But *you knew that he had done things to you way back when you were a young child,* correct?

"A. *Yes,* yes.

"Q. And *you knew that he had done things that were not right.*

"A. *That's right.*

"Q. To you, correct?

"A. Yes (indicating).

"Q. And you knew that it was Father Wernet who had done these things to you.

"A. Correct.

"Q. *And you told this to Dr. Koricke, didn't you?*

"A. *Yes.*" (Emphasis added.)

Similarly, after describing some of the incidents of abuse, appellant Toth testified as follows:

"Q. And now did you continue to go to church at St. Joseph's in Avon Lake while you were in high school?

"A. Yes, sir.

"Q. And was Father Wernet still the pastor there at that time?

"A. He left in 66.

"* * *

"Q. And who was the pastor who followed?

"A. Father Edward Dickard.

"Q. And did you ever have occasion during your teenage years to talk to Father Dickard about anything dealing with Father Wernet?

"A. No.

"Q. Did you have occasion at any time subsequent to your teenage years to have a conversation with Father Dickard regarding Father Wernet?

"A. Yes.

"Q. When would that have been?

"A. In 1989.

"* * *

"Q. And where did that take place?

"A. It took place at a Knights of Columbus picnic in Avon.

"* * *

"Q. What did you say to Father Dickard?

"A. I asked him where Father Wernet was.

"* * *

"Q. What did he say?

"A. He said what do you want to know for and I said because I need to know. What did they do to him, what—where did they put him?

"Q. And what did you mean by that?

"A. I wasn't sure what I meant by that at the time. Really didn't understand what I was even asking him.

"Q. And what did Father Dickard respond thereafter?

"A. He said well, he is dead and I said well he is dead but what did they do to him? And he said they transferred him to another parish. And I said yeah, but what did they do to him? *Did they punish him?* And he said punish him? And *I said yeah. He said what for? And I said well, the man raped me and that is the first time I ever said it out loud.*

"Q. So you told Father Dickard that you had been raped by Father Carl Wernet.

"A. Correct.

"Q. *This was at a picnic in 1989.*

"A. *Correct.*

"* * *

"Q. What other conversation did you and Father Dickard have?

"A. *I said what do you mean, was it me. It was my sister too and at that point my father walked by and Father Dickard grabbed my father and asked my father if this was true. And I had said you tell him, tell Father Dickard what Father Wernet did to Jan and [me].* (Sic) Father Dickard asked dad if it was true and dad said yes. Father Dickard said oh my god, Ray, I'm so sorry for you and my father walked away.

"* * *

"Q. Now you went home after the picnic was over.

"A. Yes.

"Q. And *did you follow up* on any of the information you had learned from Father Dickard?

"A. No.

"Q. Why not?

"A. Because *I basically felt like it didn't matter, nobody cared,* I couldn't do anything about it anyhow and they weren't interested.

"* * *

"Q. And how did you get Mr. Feliciano's [appellee's counsel's] name from Jim Cross?

"A. In the course of getting a haircut, one of the hairdressers who worked with Mr. Cross was also a patient of mine at Kaiser. Her daughter had been raped so we were discussing her rape, the mother and I were discussing the rape. And Mr. Cross and another girl chimed in and said well, I was molested too. He said so yes, there is a lot of people and *I said oh, well yeah, I was too, you know and—but I don't know what to do, can't do anything about it. My perpetrator is dead,* the man who hurt me is dead and he said well, you should still file a complaint and he gave me—he said Mr. Feliciano, this is the person you should report it to, here is his number, I used to do his wife's hair.

"Q. Okay, *when did this conversation take place* at the beauty shop?

"A. *July of 91.*" (Emphasis added.)

Appellant Beverly Francine Berlo, a.k.a. "Jane Doe I," testified that she had spoken to several people during her adulthood of the occurrence of the incidents. She testified:

"Q. Now did there ever come a time when after the incident that you have described for us today, you spoke with anyone concerning the abuse that you say happened with Father Wernet?

"* * *

"A. Yes, I did. I spoke with my mother.

"Q. Okay, when did you speak with your mom?

"A. 1986.

"Q. Now in 1986, how old were you?

"A. Just a moment, I have to think —— 30 —— 34.

"Q. All right, and how did it come to be that you spoke with your mom about this?

"A. Going through a crisis in my life and I needed to let her know about this.

"Q. And did you speak in person with her or by telephone?

"A. In person.

"* * *

"Q. Now tell me what you and your mom discussed, to the best of your recollection.

"A. I told her Father Wernet had molested me and she looked out the window as if we were discussing the weather and changed the subject.

"* * *

"Q. Do you recall what you said in terms of how many times it would have occurred?

"A. No, I don't recall.

"Q. Do you recall telling her that it happened frequently over the period of time that you have discussed with us this afternoon?

"A. Yes.

"Q. Bev, do you recall whether or not you told your mom anything specific about what had happened to you?

"A. No, we did not discuss the specifics.

"Q. You didn't discuss specifics but you did tell your mom that Father Wernet had abused and molested you.

"A. Yes.

"Q. And it had happened on more than one occasion.

"A. Yes.

"Q. Did you tell her that it happened over the period of time 1965–1966 as you have described with us today?

"A. Yes.

"* * *

"Q. And now you mentioned that you had a discussion with Terri Smith and that was probably in 1987 and this concerned the abuse of Father Wernet, right?

"A. Yes.

"* * *

"Q. And this took place within the context of the Stop Program.

"A. Yes.

"Q. And what is the Stop Program?

"A. It's a program for men and women who have children who have been sexually abused or have been abused themselves as children.

"* * *

"Q. Did you have discussions with Dr. Regotti about Father Wernet and the abuse on one or more occasions?

"A. There was more than one occasion.

"Q. And this occurred as best as you can recall over a period that encompassed approximately two years in terms of your seeing Dr. Regotti?

"A. Yes, sir.

"Q.   How often did you see Dr. Regotti, if you can recall?

"A.   I believe it was once a month.

"Q.   How did you come to see Dr. Regotti?   Were you referred by someone, did you know of him or did you find his name in the phone book or—

"A.   It was a referral.

"Q.   By whom were you referred to Dr. Regotti?

"A.   The Stop Treatment Program."

Kathleen Marie Ann Haney, a.k.a. "Jane Doe II," told Dr. Koricke that she retained a "very good memory" of Father Wernet's abuse of her at the age of eleven and had "never forgotten" one particularly memorable incident that occurred after she had gone to confession.   In her deposition, Haney testified that the abuse had affected her behavior in a negative way, stating that she "turned rotten."   She testified in her deposition as follows:

"Q.   And as far as you were concerned, it didn't matter because you had had this problem with Father Wernet in your mind and that made you a bad person, correct?

"A.   Yes.   And I always knew that I was going to go to hell, no matter what.

"Q.   And when you were doing these things, did you think of the fact that you had this problem with Father Wernet that you have described for us today?

"A.   Not really but *I already felt my whole life,* like I was—I was—you know—I don't know, *I always tried to remember what I did to make him do it.* You know, because I thought I was the only one.   If he did it, I must have asked for it or made him do it.   I couldn't remember, but I knew no kid does that but me.

"Q.   Kathy, it is true that you have always remembered the incident with Father Wernet, correct?

MS. KELLY:  Objection.

"A.   No, I forgot about it but I always felt wrong or bad or—

"Q.   You knew that that related to Father Carl Wernet, didn't you?

MS. KELLY:  Objection.

"A.   Not always, no.

"Q.   Not always but you remembered it from time to time over the course of your life time after that, didn't you?

"A.   I don't know, I don't know for sure if I did or not.   *Don't know if I wanted to remember.*

"* * *

"Q. *Do you recall telling Dr. Koricke that you have a very good memory of the abuse?*

"A. *Now I do.* I mean I know—like I said, I forgot about it, *I didn't* want to *remember it.* I wanted it to be normal, *I wanted to be normal,* I wanted to [have] good feelings about myself, I forgot about it, I just—

"Q. Do you recall telling Dr. Koricke that you had never forgot about the abuse?

"A. Inside I probably never did but to remember it on a daily basis or to remember it every time I did something, I don't— I didn't— that isn't what I mean when I said that. I meant that if anybody ever asked me about it, it would flashback and I would remember. But even like with my husband, I can remember not liking something but not really knowing why or if it was feelings, you know, you just can't put everything in place all the time.

"* * *

"Q. Do you recall telling Dr. Koricke—excuse me, withdraw that.

"You went to see Dr. Koricke on January 17th of 1994, approximately a little over a year ago, do you recall that?

"A. Don't remember the date but I know it was one time.

"Q. *Do you recall telling Dr. Koricke that you had told a friend at work about the abuse 10 years before?*

"A. I told her it was approximately—*might have been about 10 years* but it wasn't—*I didn't tell her details,* just told her I had a problem with a priest.

"Q. Is that the incident that we talked about a little bit ago with—

"A. Alice.

"Q. Alice Risdorf?

"A. Yes." (Emphasis added.)

Carolyn Kepic Kuznik, a.k.a. "Jane Doe III," testified that she had been abused by Father Wernet in 1964 at the age of ten, had "flashbacks" throughout her life that caused her to recall his "finger being on my body," told her husband of the abuse shortly after her marriage in 1982, and had "always" been aware of Father Wernet's assaults.

Sallie Ann Huber Schneider, a.k.a. "Jane Doe IV," stated that she "always knew [Father Wernet] masturbated on me" and that when she attended his funeral in 1980, she forgave him for "the things he did" against her that she described during her deposition testimony.

Although Eileen Ann Motolik Fergus Meyers, a.k.a. "Jane Doe V," told Dr. Koricke that she had "always been aware of her abuse" by Father Wernet, at the time of her deposition, Meyers indicated that she could remember almost nothing of what had occurred during three incidents she had by then recalled; however, Meyers "always remembered" the fourth incident, which occurred when she was in fourth grade. Meyers testified that she had attended confession with her sister, Kathleen Haney; afterward, Father Wernet spoke to them in the sacristy, then he was "grabbing ahold" of her across her chest, "moving" his hand there. She further testified that following their escape from the situation, although she and her sister·did not speak of it with each other, she remembered "being scared." When appellee's counsel commented, "But you knew that whatever happened with Father Carl Wernet wasn't right," Meyers' response was "Yes."

Appellant Mary Lewis, who had been treated by psychologists numerous times in her life, testified:

"Q. When was the first time that you recall being abused by Father Wernet?

"A. See, *always was able to remember.* It just was something I didn't tell people about that *he put his hand in my blouse.* But I didn't remember *the part* about him asking me to take my panties off until mom told me how I came running to her. All that started then, I remember the feelings and everything and you know, then I remembered it was just weird that *I just hadn't remembered him trying to get me to take my panties off* or anything of that and that this weird guy stuck his hand in my blouse, you know.

"Q. Like today, you can't recall whether you picked up your pants or the skirt?

"A. No.

"Q. And walked or left the rectory with those in your hand, you can't remember that?

"A. *Yeah.*

"Q. *But you have always remembered that Father Wernet had unbuttoned your blouse.*

"A. *Yeah.*

"Q. *And stuck his hand inside of your blouse.*

"A. *Yeah.*

"Q. And you just didn't tell anybody.

"A. No.

"Q. And it was when your mother mentioned to you about what she said you had yelled when you came home, you remember the other part.

"A.   Yeah, um-hum.

"Q.   But *the first part* about the blouse and the hand *you always recalled.*

"A.   *Yeah, I thought it was bad."* (Emphasis added.)

A review of the depositions thus reveals that each appellant testified to the same effect.   Unlike Civ.R. 12(B)(6), Civ.R. 56(C) makes summary judgment proper when the evidence demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 24 O.O.3d 1, 433 N.E.2d 615. A properly supported motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial.   *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264; *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095.

Civ.R. 56 also sets forth the type of documentary evidence necessary in order to support or oppose a motion for summary judgment.   In ruling on a motion for summary judgment, therefore, a court is *precluded* from considering any documentary evidence of a type not specified in Civ.R. 56(C).   *Spier v. Am. Univ. of the Caribbean* (1981), 3 Ohio App.3d 28, 3 OBR 29, 443 N.E.2d 1021; see, also, *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 567 N.E.2d 1027.   The issue of evidentiary quality is thus a matter of law, since the court is not determining credibility, but admissibility.

Obviously, the appellants in this case did not wish to directly confront their memories of the sexual abuse they suffered;   therefore, they suppressed them. However, it is equally obvious even from reading their affidavits that none of appellants had suffered a *repression* of her memories as a result of the abuse within the clinical meaning of that term.   As defined by appellants' medical experts, repression signifies the *involuntary* and *complete* loss of memory of an event, whereas suppression is merely an intentional forgetting.

Appellants suggest that *Ault* should be interpreted to suspend application of the statute of limitations until each "verified" her memory, arguing that each appellant's injury was not "discovered" until the first came forward to *report* the abuse.   This court cannot accept their suggestion, since *Ault* considered the discovery rule as applied to sexual abuse cases only in the context of a Civ.R. 12(B)(6) dismissal.   In contrast, in a case in which the victim, upon reaching the age of majority, "knew that [s]he had been sexually abused, and [s]he knew the identity of the perpetrator," this knowledge was sufficient to trigger the running of the statute of limitations.   *Doe v. First United Methodist Church,* 68 Ohio St.3d 531, 629 N.E.2d 402; see, also, *Flowers v. Walker* (1992), 63 Ohio St.3d 546, 589 N.E.2d 1284; *Scott v. Borelli* (1995), 106 Ohio App.3d 449, 666 N.E.2d 322;

*Peters v.. Medaglia* (Apr. 13, 1989), Cuyahoga App. No. 55208, unreported, 1989 WL 36709.

For the foregoing reasons, summary judgment for appellee on the basis that appellants' claims were time-barred was proper. Appellants' fourth and second assignments of error lack merit and are, accordingly, overruled.

Appellants' third assignment of error states:

"The trial court erred in granting defendant's motions for summary judgment on plaintiff Lynn Toth's claims because genuine issues of material fact exist as to whether the tolling provisions of Ohio Revised Code § 2305.16 apply."

Appellants argue that the evidence was sufficient to raise a question of fact as to whether appellant Lynn Toth was disabled within the meaning of R.C. 2305.16 at the time her cause of action accrued, thus tolling the statute of limitations and making summary judgment as to her claims inappropriate. This argument is unpersuasive.

R.C. 2305.16 provides that if a person is "of unsound mind" at the time her cause of action accrues, it may be brought within the respective times of either R.C. 2305.111 or 2305.10 "after the disability is removed."

In this case, appellant Toth testified she was born on August 28, 1950; therefore, Toth was eighteen years of age in 1968. Despite her deposition testimony quoted earlier in this opinion, which demonstrates that appellant Toth was fully aware of her cause of action throughout her adult years, appellants argue that Toth's health care providers indicate that Toth was "of unsound mind" until "August or September 1992," when she terminated her relationship with a social worker provided to her by appellee. This argument is presented despite the lack of evidence that any health care provider who knew Toth during this period so stated. *Moore v. Schiano* (1996), 117 Ohio App.3d 326, 690 N.E.2d 597.

One of appellants' experts who examined Toth after the commencement of the instant action opined that Toth was suffering from "post-traumatic stress disorder" and "major depression" that "would prohibit her from * * * coming forth." Although appellants' other medical evidence may have supported this diagnosis, R.C. 1.02(C) defines "unsound mind" to include "all forms of mental retardation or derangement." The Ohio Supreme Court has recently stated that the foregoing phrase "has been equated with insanity." *Fisher v. Ohio Univ.* (1992), 63 Ohio St.3d 484, 487, 589 N.E.2d 13, 16. Thus, the earlier and broader interpretation of unsoundness of mind set forth in *Bowman v. Lemon* (1926), 115 Ohio St. 326, 154 N.E. 317, has been superseded by a stricter interpretation of what constitutes mental disability.

In view of the fact that the Supreme Court indicated in *Doe v. First United Methodist Church* that evidence of depression, guilt, anxiety, and other forms of emotional distress in victims of childhood sexual abuse is insufficient to toll the statute of limitations, this court is unable to determine that appellants' evidence was sufficient to raise a question of fact with regard to the application of R.C. 2305.16 to Toth's claims. *Detweiler v. Slavic* (Dec. 15, 1994), Cuyahoga App. No. 66718, unreported, 1994 WL 706151; *Peters v. Medaglia, supra; Horn v. Reese* (Oct. 11, 1995), Hamilton App. No. C–940934, unreported, 1995 WL 596065; cf. *Hogle v. Harvey* (Sept. 29, 1995), Ashtabula App. No. 94–A–0055, unreported.

Therefore, the trial court did not err in granting appellee's motion for summary judgment. *Casey v. Casey* (1996), 109 Ohio App.3d 830, 673 N.E.2d 210; *Winters v. Cleveland Clinic Found.* (May 1, 1997), Cuyahoga App. No. 71110, unreported, 1997 WL 218416; cf. *Wells v. Bowie* (1993), 87 Ohio App.3d 730, 622 N.E.2d 1170.

Accordingly, appellants' third assignment of error is also overruled.

Finally, appellants' first assignment of error states:

"The trial court erred in granting defendant's motion for summary judgment because genuine issues of material fact exist for reasonable minds to find that the doctrine of equitable estoppel barrs [*sic*] defendant from the benefit of the statute of limitations."

█ Appellants argue that the conduct of appellee and its priests caused them to delay asserting their claims against appellee; therefore, the doctrine of equitable estoppel should be applied to preclude appellee from asserting a defense based upon the statute of limitations. Under Ohio law, the doctrine of equitable estoppel may be employed to prohibit inequitable use of the statute of limitations. *Schrader v. Gillette* (1988), 48 Ohio App.3d 181, 183, 549 N.E.2d 218, 220–221; see, also, *Cerney v. Norfolk & W. Ry. Co.* (1995), 104 Ohio App.3d 482, 662 N.E.2d 827.

This court has recently addressed the issue of equitable estoppel in a context similar to that of the case *sub judice* and stated as follows:

"The doctrine of equitable estoppel may be employed to prevent a defendant from asserting an otherwise valid right. *Lewis v. Motorists Ins. Cos.* (1994), 96 Ohio App.3d 575 [645 N.E.2d 784]. * * * In order to establish equitable estoppel, a plaintiff must demonstrate: (1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) that induces actual reliance which is reasonable and in good faith; and (4) which causes detriment to the relying party. *Doe v. Blue Cross/Blue Shield of Ohio* (1992), 79 Ohio App.3d 369 [607 N.E.2d 492]." *Moore v. Schiano, supra,* at 331, 690 N.E.2d at 600.

■ With regard to the first two elements set forth above, the Ohio Supreme Court has indicated that a showing of "actual or constructive fraud" is necessary. *State ex rel. Ryan v. State Teachers Retirement Sys.* (1994), 71 Ohio St.3d 362, 368, 643 N.E.2d 1122, 1128. Furthermore, in the context of a statute-of-limitations defense, plaintiff must show either "an affirmative statement that the statutory period to bring an action was larger than it actually was" or "promises to make a better settlement of the claim if plaintiff did not bring the threatened suit," or "similar representations or conduct" on defendant's part. *Cerney v. Norfolk & W. Ry. Co.*, 104 Ohio App.3d at 488, 662 N.E.2d at 830. See, also, *Walworth v. BP Oil Co.* (1996), 112 Ohio App.3d 340, 678 N.E.2d 959.

■ It must first be noted that appellants made no claim of fraud against appellee in their complaint. Cf. *Lewis v. Motorists Ins. Cos.* (1994), 96 Ohio App.3d 575, 585, 645 N.E.2d 784, 790, fn. 2. Appellants also failed to introduce any competent evidence in response to appellee's motions for summary judgment to demonstrate that either appellee or its priests engaged in any misrepresentations or conduct aimed at misleading appellants with regard to the filing of their claims. In their affidavits, appellants merely made statements to the effect that they were told by priests that they were "not to tell" of the incidents or that appellants would "bring down the church" if they filed suit. These statements, however, were insufficient to establish the first two elements of the doctrine of equitable estoppel. *State ex rel. Ryan v. State Teachers Retirement Sys.*, 71 Ohio St.3d 362, 643 N.E.2d 1122; *Cerney v. Norfolk & W. Ry. Co.*, 104 Ohio App.3d 482, 662 N.E.2d 827. Appellants' allegations that appellee destroyed evidence, moreover, were completely unsupported.

Secondly, appellee's evidence demonstrated that appellants neither reasonably nor in good faith relied upon appellee's "authority" over them in failing to timely assert their claims. Most of the appellants acknowledged in their deposition testimony that they felt little attachment to either appellee or their church. In the absence of evidence to contradict these admissions, appellants thus were unsuccessful in establishing the third element of the doctrine of equitable estoppel as well. *Schrader v. Gillette*, 48 Ohio App.3d 181, 549 N.E.2d 218; cf., *Walworth v. BP Oil Co.*, 112 Ohio App.3d 340, 678 N.E.2d 959.

Therefore, the trial court did not err in failing to apply the doctrine of equitable estoppel to bar appellee from asserting its statute-of-limitations defense on appellants' claims. Appellants' first assignment of error is, accordingly, also overruled.

*Judgment affirmed.*

NAHRA, P.J., and TIMOTHY E. McMONAGLE, J., concur.