OPINION.
Defendant-appellant James Zifer appeals from the judgment of the trial court in which the court, following a bench trial, held that Zifer had violated his independent-contractor agreement with plaintiff-appellee Financial Dimensions, Inc. Zifer claims that the contract was unenforceable and that, in any event, he did not violate any of its terms. Financial Dimensions has cross-appealed the court's judgment in favor of Zifer on Zifer's claims for unpaid commissions and the court's calculation of damages. We affirm the judgment of the trial court, as modified in accordance with the terms of this decision.
Zifer worked as an independent contractor for Financial Dimensions from approximately 1987 to 1996. Financial Dimensions supplied Zifer with leads, or names of potential customers, and Zifer's responsibility was to sell insurance to these persons. Each application for insurance that Zifer obtained from a lead given to him by Financial Dimensions was required to be placed through Financial Dimensions, and the company thereafter obtained the particular insurance plan from a variety of agencies. Financial Dimensions received a commission from the agency with which the insurance was placed, and Zifer was paid a commission from Financial Dimensions for each completed sale.
In 1988, Zifer was given a written independent-contractor agreement and informed that if he did not sign the agreement, he would no longer receive leads from Financial Dimensions. The contract stated in part:
 WHEREAS, Financial Dimensions through the efforts of its agents and employees has developed lists of prospective clients for the purchase of various life insurance and other investment products; and
 WHEREAS, Contractor is engaged in the sale of life insurance and other investment products and has expressed a desire to assist Financial Dimensions in using the lists of prospective clients in the sale of insurance and related products[,]
 NOW therefore it is agreed that Financial Dimensions Agency, Inc. shall furnish Contractor with names and addresses of prospective clients and Contractor by himself and through his agents and/or employees shall endeavor to contact these prospective clients to make them acquainted with various life insurance products and to sell said products to them.
* * *
 NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties hereto mutually covenant and agree as follows:
* * *
 2. The Contractor herein agrees to diligently, loyally and exclusively give all of his best skill and effort during the time he has agreed to work for Financial Dimensions, Inc., doing everything he can to promote the continued success of Financial Dimensions, Inc. business; and in abstaining from doing or saying anything that would make it more difficult for Financial Dimensions, Inc. to carry on its business. * * *
 3. Financial Dimensions, Inc. or the Contractor may terminate this Agreement at any time for any reason, without notice. Financial Dimensions, Inc. shall be obligated in that event, to pay the contractor his compensation up to the date of the termination of his employment, provided the Contractor has not violated any of the restrictive covenants of this Agreement. * * *
 4. Contractor further agrees that all clients are valuable Business Assets of Financial Dimensions, Inc. and for a period of two years after termination of this Agreement the Contractor will not directly or in any way indirectly solicit any client or render any service directly or indirectly, for any of the above mentioned clients. Contractor agrees that the foregoing is a reasonable restriction.
 5. Contractor agrees that for a period of two years following the termination of his service hereunder, he will not do or say anything that will make it more difficult for Financial Dimensions, Inc. to carry on its business * * *. Contractor agrees that the foregoing is a reasonable restriction.
Prior to 1996, Zifer placed all insurance or other investment-product applications through Financial Dimensions, Inc., regardless of the source of the lead for the potential client. Zifer obtained leads from Financial Dimensions, Inc., that had been supplied to Financial Dimensions by Roy Whited, an insurance agent, and he obtained leads from other sources, such as his family and friends. In 1996, Whited took over ownership of Preferred Financial, the company that had previously employed him.
Also in 1995 or 1996, Zifer learned that another insurance agent, Bob Deseyn, was going to retire. Zifer, who had known Deseyn since childhood, contacted Deseyn to obtain leads from Deseyn's existing client base. Zifer sold several investment products to clients whose names were provided to him by Deseyn.
On November 11, 1996, Zifer went to the home of the owner of Financial Dimensions, Inc., Tony Ferris. Zifer read a prepared statement to Ferris in which he informed Ferris that he wished to reduce his employment with Financial Dimensions, Inc., to part-time employment. Zifer stated that because of the poor health of his parents, he felt obligated to move to central Ohio to be nearer to them, and that he planned to work with Roy Whited and Preferred Financial. He informed Ferris that he planned to work also with Thomas Cooper, an attorney, who had in the past given investment seminars to Financial Dimensions clients and generated leads for Financial Dimensions.
Ferris, after talking to Zifer, believed that Zifer had breached his independent-contractor agreement by talking with Whited and Cooper and obtaining leads from them. On November 18, 1996, Ferris informed Zifer that Financial Dimensions was terminating his contract effective immediately. Ferris learned by talking with Zifer that Zifer had obtained leads from and sold investment products to clients through Preferred Financial. Although Zifer had contacted the clients and filled out the necessary applications for the investments, he did not sign the applications as the contracting agent. Whited and another agent who worked for Preferred Financial signed the applications.
Whited testified that Zifer did not sign the applications as the contracting agent because Zifer had assigned all of his commissions to Financial Dimensions. To prevent Financial Dimensions from learning of the applications and the sales of investment products through Preferred Financial, either Whited or another agent signed the applications. Zifer still received a commission from each sale.
After the termination of the agreement between Zifer and Financial Dimensions, Financial Dimensions filed suit against Zifer for breach of contract. The complaint alleged that Zifer had breached the contractor agreement by placing investment sales through Preferred Financial while Zifer was still employed by Financial Dimensions. The complaint further stated that after Zifer was terminated, he solicited business from Financial Dimensions clients, in violation of the restrictive covenants in the contract. Zifer counterclaimed for unpaid commissions.
Following a bench trial, the court held that Zifer had breached his contract with Financial Dimensions when he took applications from clients whose names were given to him by Whited and whose investments were placed through Preferred Financial. The court also held that Zifer had violated the restrictive covenant of his agreement with Financial Dimensions when he sold investments, through Preferred Financial, to clients of Financial Dimensions. The court awarded Financial Dimensions the value of the commissions it would have received had the accounts been placed through Financial Dimensions, less the commissions that would have been paid to Zifer for the accounts. The court also held that Zifer was entitled to commissions for accounts he had sold, with the exception of one sale, which was not completed before Zifer was terminated.
In his first assignment of error, Zifer claims that the trial court erred in its determination that Zifer had breached the independent-contractor agreement. First, Zifer argues that he received no consideration for signing the contract, which was given to him eighteen months after he began working for Financial Dimensions. Zifer cites Cohen v. Messina[1] for the proposition that "a restrictive covenant in a contract for services is void for lack of consideration where it was not included in the original contract of employment but was included in a subsequent contract for continued employment and was included strictly for the protection of the employer." Zifer claims that a promise to do what one is already bound to do is not sufficient consideration to support a contract.
Ferris, the owner of Financial Dimensions, stated that he told the independent contractors that signing the written contract was necessary to Financial Dimensions' obligation to continue to provide leads to the agents. He stated that they would no longer be given leads from Financial Dimensions if they did not sign the agreement. Ferris also testified that he increased the amount of Zifer's draw against his commissions. Zifer does not dispute these facts.
Since 1985, when Cohen was decided, the majority of courts have rejected the reasoning in Cohen and Morgan Lumber Sales Co. v.Toth,[2] the case upon which the Cohen court relied, as it applies to restrictive covenants entered into between an employer and employee after an at-will employment relationship has already begun.[3] These courts hold that the employer's continued employment of the employee after the employee signs or agrees to the restrictive covenant is sufficient consideration to support the employer's later enforcement of the agreement, since, as a result of the at-will nature of the employment, neither employer nor employee is obligated to continue the relationship for any period of time. Continued employment, therefore, goes beyond what the employer and employee are already obligated to do and constitutes sufficient consideration.
As stated by the court in Copeco, "As a practical matter every day is a new day for both employer and employee in an at-will relationship. As stated supra, we see no substantive difference between the promise of employment upon initial hire and the promise of continued employment subsequent to `day one.'"[4]
Likewise, the court in Trugreen LP v. Richwine aptly noted:
The distinction between an indefinite promise of employment made when an employee is initially hired and an indefinite promise of employment to an existing employee seems artificial to us. It would either permit the employer who finds itself in legitimate need of covenants not to compete from certain of its employees to fire them all and then require them, as a condition of being re-hired, to execute covenants not to compete, or, worse yet, it would require the employer to fire those employees and inform them that as much as it would like to re-hire them, it is forced to hire new employees to replace them, so that it may obtain covenants not to compete that are reasonably related to its legitimate business needs. We doubt that an employee who would be fired so that he could be replaced with an employee who could properly be required to execute a legitimate covenant not to compete as a condition of his initial hire would appreciate the benevolent paternalism implicit in preventing the employer from simply requiring the existing employee to execute a covenant not to compete as a condition of his continuing employment.[5]
We note, first, that Zifer was not an at-will employee but an independent contractor. However, the distinction is not relevant to the issue under consideration, and we find the cases dealing with continued employment to be applicable to a relationship with an independent contractor.
Here, Ferris testified that he specifically informed the independent contractors that agreeing to the restrictive covenants was a condition of their receipt of further leads, or, in other words, the continuation of their contractual relationship. Such a continuation, when Ferris was under no obligation to continue the relationship, constituted consideration for Zifer's reciprocal promise to abide by the terms of the contract. We therefore hold that Ferris's continuation of the parties' relationship was sufficient consideration to support Zifer's agreement to the provisions in the covenant not to compete.
Zifer next alleges that the terms of the restrictive covenants were unreasonable and therefore unenforceable. A covenant prohibiting an employee from competing with a former employer is reasonable when the terms are no more restrictive than necessary to protect the employer's interest, when the restriction does not impose an undue hardship on the employee, and when the covenant is not injurious to the public.[6] Some of the factors the court is to consider in making this determination are the duration of the restriction of competition, the geographic area in which the employee is prohibited from competing, whether the employee has trade secrets or confidential information, whether the covenant bars the employee's sole means of support, and whether the restriction seeks to eliminate only unfair competition or actually seeks to eliminate all competition.[7]
In this case, Zifer claims that the restrictive covenants were unreasonable to the extent that they prohibited Zifer from contacting and selling to any Financial Dimensions client. Zifer claims that many of the clients did not become clients through leads provided by Financial Dimensions, but were sources developed by Zifer through friends, family and Bob Deseyn. The covenant prohibiting Zifer from contacting or selling to Financial Dimensions' clients did not distinguish between accounts or clients that were obtained by leads provided to Zifer and those that resulted from leads Zifer developed on his own.
The trial court found that the restriction against contacting any of Financial Dimensions' clients, regardless of the origin of the lead that led to a particuliar client's account, was reasonable. When a contract is clear and unambiguous, its interpretation is a matter of law subject to de novo review.[8]
We hold that the restrictions in the covenant not to compete were reasonable and enforceable. The independent-contractor agreement stated that "all clients[,]" regardless of the source of their procurement, were "valuable Business Assets of Financial Dimensions, Inc." (Emphasis added.) The evidence presented at trial supported this claim. Zifer and another contractor with Financial Dimensions, James Misheff, testified that for the last two years of Zifer's employment, almost all of the work consisted of reselling to existing clients. Zifer's earnings, which consisted entirely of commissions, exceeded $150,000 in both 1995 and 1996. Thus, the existing client base was a valuable asset to Financial Dimensions and its agents.
We reject Zifer's argument that Financial Dimensions had no legitimate interest in preventing former agents from contacting Financial Dimensions clients. Although Zifer argues at length that the only reasonable interpretation of the contract was that the covenants restricted contact only with those who became clients due to a lead provided by Financial Dimensions, we hold that the unambiguous language of the contract prohibited Zifer from contacting any existing client of Financial Dimensions, regardless of the original manner in which a client came to Financial Dimensions.
In this case, the trial court awarded damages based not only on Zifer's contact of existing Financial Dimensions clients following his termination, but also on his contact of clients who purchased investment products that were placed through Preferred Financial instead of Financial Dimensions. Zifer assigns error to this ruling, arguing that the contract obligated him to place with Financial Dimensions only those sales that resulted from leads provided by Financial Dimensions, and that he was permitted under the contract to place investment sales with Preferred Financial when those sales did not result from a Financial Dimensions lead but from his own resources.
Again, we hold that the contract unambiguously required Zifer to give his efforts exclusively to benefit Financial Dimensions. There was further evidence to demonstrate that both parties understood that all sales, not just those generated from leads provided by Financial Dimensions, were to be placed through Financial Dimensions. First, until 1996, all of the sales that Zifer generated, whether obtained as a result of leads provided by Financial Dimensions or through his own efforts, were placed through Financial Dimensions. Zifer had assigned all of his commissions from the sale of insurance or other investments to Financial Dimensions, which then took a commission for itself and paid Zifer a commission.
Other evidence showed that Zifer did not sign the applications for insurance or investments that were placed through agencies other than Financial Dimensions, expressly because he did not want the commissions assigned to Financial Dimensions, nor did he want Financial Dimensions to know that he was placing orders through another agency. Zifer's conduct evinced an understanding of the contract obligations that was in accordance with the interpretation given by the trial court, and, based on our de novo interpretation of the contract, we hold that the contract prohibited Zifer from placing accounts through companies other than Financial Dimensions while the independent-contract or agreement remained in force.
Zifer next argues that Financial Dimensions waived its right to enforce the agreement against Zifer because it permitted other contractors to place business at agencies other than Financial Dimensions. Zifer's argument is actually twofold: first, that Financial Dimensions was estopped from enforcing the non-competition agreement, and, second, that Financial Dimensions waived its right to enforce the agreement. Although similar, these defenses to enforcement of the agreement require separate analysis.
To establish promissory estoppel, Zifer must prove (1) a clear, unambiguous promise; (2) reliance upon the promise; (3) the reasonableness and foreseeability of the reliance; and (4) injury as a result of the reliance.[9] According to Zifer, Ferris permitted other independent contractors to place business with other agencies, and this conduct constituted a promise that such outside activity would not violate the contract between them.
At trial, Ferris testified that he had, on occasion, given permission to other contractors to place business with other agencies, but only when the contractor specifically requested the placement and when the placement was with an agency that handled business that Financial Dimensions did not. The extent of Zifer's knowledge of the other contractors' work with Financial Dimension consisted of his having seen the policies that were written and processed through other agencies.
We agree with the trial court that Ferris's conduct did not rise to the level of a specific, unambiguous representation or promise. Allowing agents, on occasion and upon request, to deviate from the terms of their contracts did not amount to a representation that the exclusivity clause of the independent-contractor agreement would never be enforced.
Additionally, we believe that the record supports the finding that Zifer did not actually believe that violating the exclusivity clause of the contract was acceptable conduct and that he did not actually rely on any such representation. Actual or good-faith reliance is necessary to prove a claim of estoppel.[10] The subterfuge in which Zifer and Whited engaged — submitting applications for insurance or other investments under another agent's signature — demonstrated Zifer's belief that Ferris would seek to enforce the exclusivity provision. Such subterfuge would have been unnecessary had Zifer actually believed that he was permitted to place accounts through another agency if the account were obtained by his own work and not from leads provided to him from Financial Dimensions.
Zifer also claims that Financial Dimensions waived its right to enforce the exclusivity provision. Waiver is a voluntary relinquishment of a known right.[11] In order to prove that Financial Dimensions waived its rights, Zifer had to prove "a clear, unequivocal, decisive act * * * showing such a purpose or acts amounting to an estoppel * * *." [12]
We agree with the trial court that Zifer failed to prove that Ferris or Financial Dimensions waived the right to enforce the contract. With the one exception of allowing some agents to place accounts through another agency, Ferris did not say anything or do anything to waive his right to enforce the contract. Because Zifer hid the fact that he was placing business through another agency, Ferris did not knowingly allow that conduct and therefore could not knowingly waive his right to enforce the exclusivity clause of the contract.
For all of the foregoing reasons, we overrule Zifer's first assignment of error relating to the validity and enforcement of his contract with Financial Dimensions.
In his second assignment of error, Zifer claims that the trial court erred when it determined that he was not entitled to receive commissions from the sale of a life insurance policy to Virginia Brown, a client of Financial Dimensions. Zifer had asserted a counterclaim for commissions that Financial Dimensions had failed to pay him for sales he had made prior to his discharge. The trial court awarded Zifer the unpaid commissions on all of the accounts except the Brown account.
We review the trial court's decision to determine whether it is supported by some competent, credible evidence in the record.[13] The record shows that although Zifer took an application from Ms. Brown prior to the time that he was terminated, the application was initially rejected because Ms. Brown's drug test returned a positive result for tobacco. Through Ferris's efforts, the drug-testing company allowed Ms. Brown to submit to another test, and the policy was later approved.
Zifer argues that he was the procuring cause of the life insurance policy and that he was prevented from completing the sale and delivering the policy only because Ferris terminated his employment. The written agreement between the parties did not specify the actions that were necessary for an agent to earn a commission. The contract did state, however, that upon termination by either party, "Financial Dimensions shall be obligated * * * to pay the Contractor his compensation up to the date of the termination of his employment, provided the Contractorhas not violated any of the restrictive covenants of thisAgreement." (Emphasis added.)
The trial court awarded Zifer some compensation for accounts that he had procured before his termination but that were not delivered or completed until after his termination, with the exception of the Brown account. The trial court explicitly held, and we have agreed, that Zifer violated the terms of his contract when he placed customer accounts with an agency other than Financial Dimensions. The trial court did not specifically rule upon the enforceability of this restrictive provision as it related to commissions, but Financial Dimensions raises as its first assignment of error the trial court's award of commissions. We therefore address Zifer's second assignment of error and Financial Dimensions' assignment of error together.
Financial Dimensions argues that, under the faithless-servant doctrine, Zifer was not entitled to recover any commissions because of his breach of the restrictive covenants. In Roberto v. Brown County General Hospital,[14] the court explained the faithless-servant doctrine in these terms:
2 Restatement of the Law 2d, Agency (1958), Section 469, states:
 "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a willful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned."
Clearly, the "faithless servant doctrine" is a recognized rule of law in the state of Ohio which requires a disloyal and deceitful employee to forgo his compensation during such period of "faithlessness." The Cuyahoga County Court of Appeals in Hey [v.Cummer (1950), 89 Ohio App. 104, 139, 97 N.E.2d 702, 719], followed this legal principle, quoting Lamdin v. Broadway SurfaceAdvertising Corp. (1936), 272 N.Y. 133, 5 N.E.2d 66, as follows:
"`An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services. * * *'"Hey, supra, at 140-141, * * * 97 N.E.2d at 720.
(Emphasis added.)
The parties' contract in this case incorporates the faithless-servant doctrine. Because the trial court specifically held that Zifer had breached the agreement, Zifer was not entitled to recover any unpaid commission after he breached the contract. Zifer's second assignment of error is overruled, and Financial Dimensions' first assignment of error is sustained.
Financial Dimensions also argues that the trial court erred in its calculation of Financial Dimensions' damages. The trial court awarded Financial Dimensions the commissions that Financial Dimensions would have made on the sales that Zifer improperly placed with another agency, minus Zifer's commissions. Financial Dimensions argues that the trial court erred in reducing its breach-of-contract damages by the amount that Zifer would have been paid for each sale.
Generally, the measure of damages for a breach of contract is the amount necessary to place the nonbreaching party in the position he or she would have been in had the breaching party fully performed under the contract.[15] In this case, damages should have been measured by the amount that Financial Dimensions would have received in commissions had Zifer had placed the contracts through Financial Dimensions. Since Financial Dimensions would have had to pay Zifer commissions for the contracts, the trial court properly reduced Financial Dimensions' damages by the amount of the commissions.
The faithless-servant doctrine, which precluded Zifer's recovery of commissions after he breached the contract, has no application in the determination of Financial Dimensions' damages. That doctrine applies only to claims for payment for services rendered, and the trial court properly disregarded the rule in assessing Financial Dimensions' damages.
The trial court awarded Financial Dimensions the sum of $24,789.88 and awarded Zifer $7,500 on his counterclaim. We hold that Financial Dimensions was entitled to recover the entire $24,789.88, but that Zifer was not entitled to recover any sums on his counterclaim. With the damage award on the counterclaim eliminated, the judgment of the trial court is accordingly affirmed.
Judgment affirmed as modified.
 Doan, P.J., concurs and Painter, J., concurs separately.
[1] (1985), 24 Ohio App.3d 22, 492 N.E.2d 86.
[2] (1974), 41 Ohio Misc. 17.
[3] See Copeco, Inc. v. Caley (1992), 91 Ohio App.3d 474,632 N.E.2d 1299; Nichols v. Waterfield Financial Corp. (1989),62 Ohio App.3d 717, 577 N.E.2d 422 (citing O'Brien v.Prod. Eng. Sales Co. [Jan. 8, 1988], Montgomery App. No. 10417, unreported, and Wellendorf v. Local Union 377 [June 7, 1988], Mahoning App. No. 87 C.A. 37, unreported); Trugreen LP v. Richwine
(June 29, 1994), Clark App. No. 3098, unreported; OGIA/RogersAgency Inc. v. Estep (Nov. 6, 1990), Franklin App. No. 90AP-313, unreported; and Chrysalis Health Care, Inc. v. Brooks (1994),65 Ohio Misc.2d 32, 640 N.E.2d 915. But, see, PrinzOffice Equipment Co. v. Pesko (Jan. 31, 1990), Summit App. No. 14155, unreported (mere promise of continued employment to an existing employee at will is not sufficient consideration to support a covenant not to compete). Some courts continue, however, to hold that when an employee attempts to enforce a promise or new contract term given or entered into subsequent to his initial employment, the employee has not provided sufficient consideration by his continued employment to render the new agreement or promise binding on the employer. See, e.g., Kaufmann v. Fiduciary Mgt., Inc. (Sept. 8, 1993), Hamilton App. No. C-920399, unreported; Heider v.Glasstech, Inc. (July 16, 1999), Wood App. No. WD-98-052, unreported. Since that is not the situation in this case, we believe that those cases are inapposite.
[4] 91 Ohio App.3d 474, 477, 632 N.E.2d 1299, 1301.
[5] Trugreen LP v. Richwine (June 29, 1994), Clark App. No. 3098, unreported.
[6] See Raimonde v. Van Vlerah (1975), 42 Ohio St.2d 21,325 N.E.2d 544, paragraph two of the syllabus.
[7] Id. at 25, 325 N.E.2d at 547.
[8] See Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm (1995),73 Ohio St.3d 107, 108, 652 N.E.2d 684, 686.
[9] Healey v. Republic Powdered Metals, Inc. (1992), 85 Ohio App.3d 281,284-285, 619 N.E.2d 1035, 1037; Restatement of the Law 2d, Contracts (1973), Section 90; Weiper v. W.A. Hill Assocs.
(1995), 104 Ohio App.3d 250, 260, 661 N.E.2d 796, 803.
[10] See Livingston v. Diocese of Cleveland (1998), 126 Ohio App.3d 299,315, 710 N.E.2d 330, 339-340; Doe v. Blue Cross Blue Shieldof Ohio (1992), 79 Ohio App.3d 369, 381, 607 N.E.2d 492, 500;Payne v. Cartee (1996), 111 Ohio App.3d 580, 589,676 N.E.2d 946, 952.
[11] See The White Co. v. The Canton Trans. Co. (1936), 131 Ohio St. 190,2 N.E.2d 501, paragraph one of the syllabus; State exrel. Ryan v. State Teachers Retirement Sys. (1994), 71 Ohio St.3d 362,368, 643 N.E.2d 1122, 1128.
[12] See White Co., supra, at 198-199, 2 N.E.2d at 505.
[13] See Cole v. Complete Auto Transit, Inc. (1997), 119 Ohio App.3d 771,777, 696 N.E.2d 289, 293.
[14] (1989), 59 Ohio App.3d 84, 86, 571 N.E.2d 467, 469-470.
[15] F. Enterprises, Inc. v. Kentucky Fried Chicken Corp. (1976),47 Ohio St.2d 154, 159, 351 N.E.2d 121, 125.