DOE, Appellant,

v.

**BLUE CROSS/BLUE SHIELD OF OHIO et al., Appellees.**

[Cite as *Doe v. Blue Cross/Blue Shield of Ohio* (1992), 79 Ohio App.3d 369.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–617.

Decided April 21, 1992.

---

*Luper, Wolinetz, Sheriff & Neidenthal, Stanley L. Myers* and *James R. Leickly,* for appellant.

*Thompson, Hine & Flory, George F. Karch, Jr.* and *Barry L. Lubow,* for appellee Blue Cross/Blue Shield of Ohio.

*Vorys, Sater, Seymour & Pease, Bruce L. Ingram* and *James E. Arnold,* for appellee Harding Hospital, Inc.

---

McCORMAC, Judge.

Plaintiff-appellant, John Doe, appeals an order of the Franklin County Court of Common Pleas which granted summary judgment for defendant-appellee Harding Hospital, Inc., on appellant's amended complaint and on Harding's counterclaim, which judgment was purportedly made final by the addition of Civ.R. 54(B) language. Appellant asserts four assignments of error as follows:

"I. The Trial Court erred in granting the Motion of the Defendant Harding Hospital for Summary Judgment, finding that Defendant Harding Hospital owed Plaintiff no duty in the interpretation of his health insurance coverage under a group health policy issued by Defendant Blue Cross/Blue Shield of Ohio.

"II. The Trial Court erred in granting the Motion of Harding Hospital for Summary Judgment, finding that Plaintiff failed to establish a prima facie case on its claims for estoppel against Defendant Harding Hospital.

"III. The Trial Court erred in granting the Motion of Defendant Harding Hospital for Summary Judgment on its Counterclaim for payment of all hospital and physician charges incurred for the treatment of Plaintiff's daughter, Jane Doe.

"IV. The Trial Court erred in denying the Motion of Plaintiff for Partial Summary Judgment against Defendant Blue Cross/Blue Shield of Ohio seeking a declaration as to the meaning of certain terms utilized by defendant

Blue Cross/Blue Shield of Ohio in its health insurance contract under which Plaintiff was insured." [1]

█ Upon a motion for summary judgment, Civ.R. 56 requires that the trial court examine the evidence, drawing all inferences in the light most favorable to the party opposing the motion, and determine whether: (1) the moving party has demonstrated that there is no genuine issue of any material fact; (2) the moving party is entitled to summary judgment as a matter of law; and (3) whether reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion is made, after having construed the evidence most strongly in his favor. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267.

Due to the complicated nature of this case, we will state the facts before proceeding to a specific analysis of each of the remaining assignments of error. This case involves a dispute over insurance coverage for medical expenses incurred by appellant's minor daughter, Jane Doe, during her inpatient mental health treatment at Harding Hospital, a private psychiatric hospital in Worthington, Ohio. Blue Cross administered the group health insurance policy provided by appellant's employer. The portions of the policy, which are primarily the subject of appellant's appeal of his claim against Blue Cross, but which are relevant to his case against Harding, basically provide insureds with one hundred percent hospitalization coverage, including room and board, after application of the deductible and co-pay provisions. Another portion of the policy, however, limits "inpatient mental health" care to thirty-one days per year.[2]

---

1. We dismissed appellant's appeal against Blue Cross/Blue Shield on August 9, 1991 for lack of subject-matter jurisdiction because the denial of a motion for summary judgment is not a final appealable order. Thus, appellant's fourth assignment of error is not ripe for review.

2. The relevant policy provisions specifically provide:
 "**MAXIMUMS PER BENEFIT PERIOD PER COVERED PERSON**
 "**Inpatient Mental Health Care, Drug Abuse and Alcoholism Services**
 "31 days of stay
 "**Outpatient Mental Health Care Services**
 "$1,000
 " * * *
 "**MAXIMUM BENEFIT PAYABLE PER LIFETIME**
 "For all Covered Services
 "$2,500,000 per Covered Person
 " * * * "
 Under the description of Health Care Benefits, Mental Health Care Services are described specifically as individual psychotherapy, psychological counseling and family counseling without a distinction of whether the treatment is inpatient or outpatient. Moreover, the policy provides:

Appellant's evidence established that he and his wife, Mary Doe, admitted their teenage daughter, Jane Doe, to Harding Hospital's Emergency Services Unit on the evening of September 14, 1988, following her attempted suicide. Upon Jane's admission to Harding Hospital's Emergency Services Unit, Jane and John Doe signed an admission form which contained an assignment of insurance benefits and the following financial responsibility statement: "The undersigned assumes responsibility for payment of all hospital and physician charges incurred on behalf of the above-named patient * * *." There is no other admission form contained in the record.

Mary Doe's deposition testimony was that Jane's first consultation at Harding Hospital was with a clinical social worker who advised the Does that a psychiatric evaluation, as well as a determination by the secretary on duty of the extent of Jane's insurance coverage, was necessary to ascertain whether Jane required an overnight stay in the emergency unit. There is no testimony that Harding asked for or that the Does offered a copy of their insurance policy upon Jane's initial admission to the emergency unit on September 14, 1988. Ultimately, a psychiatrist advised Mrs. Doe to admit Jane to Harding's South Berkley Facility for a more complete short-term evaluation. The purpose of Jane's short-term inpatient care was to complete a diagnosis and develop a comprehensive long-term treatment plan.

The next day the Does were informed by Harding's clinical social worker in its emergency services, Susan Shwed, that Jane's inpatient emergency care at the South Berkley Facility was covered by Mr. Doe's employee benefit plan with Blue Cross/Blue Shield of Ohio. Shwed claimed that she obtained appellant's insurance information from a form letter prepared by another Harding employee, Janet Porter, which recited in relevant part:

"Dear Mr. Doe,

"**Benefits After Termination of Coverage**
"If you are an Inpatient of a Hospital or Skilled Nursing Facility on the day your coverage stops, the benefits listed under the Inpatient Services section, subsections Bed, Board and General Nursing Services and Ancillary Services only, subject to any changes in your Group benefits, will continue until the earliest of:
"—we pay your maximum benefits; or
"—you leave the Hospital or Skilled Nursing Facility; or
"—the end of the Benefit Period in which your coverage stopped; or
"—you have other group health coverage for the condition that requires your Inpatient Hospital or Skilled Nursing Facility care.
"* * *"
"Inpatient" is distinguished from "outpatient" in the definitional section of the policy as a beneficiary "for whom a room and board charge is made."
Finally, in describing how benefits are paid, the policy contains the following disclaimer:
"If we have erroneously paid for services and it is later discovered that we have paid for services which are not considered Covered Services under this Certificate, then we have the right to recover and you are responsible to repay such amounts when requested to do so."

"This is to confirm your insurance coverage as it was interpreted to us by Miss Thurman at Blue Cross and Blue Shield N.E. OH carried by yourself through * * * Co. Inc. According to them, coverage is as follows:

"Comprehensive Policy for Hospital and Professional: $100 deductible per cal yr/person; 80% usual & customary rates until $500 out of pocket, then 100% usual & customary rates 2½ million life maximum for psych which is considered same as any other illness under the comprehensive plan per Miss Thurman.

"Please keep in mind that this was only a verbal confirmation with the insurance company, not a guarantee of payment. We cannot be held liable if the insurance company rules contrary to this coverage at a later date.

"Based on the above coverage, present rates at the hospital, and depending on prior claims submitted for treatment, your liability, after insurance is likely to be: $600 for deductible and co-insurance plus any charges over the usual & customary rates.

"We must expect your portion upon receipt of your monthly statement, and if your insurance company does not respond within 45 days, we will expect payment in full from you.

"Your balance is due on receipt after the insurance company has made its final payment. * * *

"By my signature I agree to be financially responsible for treatment for:

"Jane Doe * * *."

Appellant signed this letter on September 15, 1988, and a time stamp reveals that it was received by Harding's Admission Office on October 10, 1988.

Blue Cross telephone records, however, indicate a very different account of the telephone conversation between its employee, Ms. Thurman, and Harding Hospital on September 15, 1988. Thurman testified about the procedure followed by Blue Cross phone operators when medical providers routinely called to verify a patient's insurance coverage prior to hospital admission or emergency treatment. The procedure requires phone operators to record in writing the substance of the information requested of and given by Blue Cross as a result of every provider inquiry call. Thurman testified from her telephone records of September 15, 1988, that she recorded the call from Harding which inquired about the extent of medical coverage available to Jane Doe for inpatient care at a psychiatric hospital. The phone record, which was admitted into evidence, recites that Thurman told Harding representatives that Jane was covered "thirty-one days at 80% for inpatient medical psych."

Mrs. Doe testified that, by the fourth day after Jane's arrival at Harding, Shwed twice met with the Does for therapy. At the first meeting, Shwed allegedly requested that the Does deliver a copy of the policy to her so that Harding's patient accounts manager, Anna Pfeiffer, could determine whether Jane's insurance benefits qualified her for admission to long-term care at Harding. Mrs. Doe testified that her husband delivered a copy of the policy to Harding for that purpose, and that Harding's offer to determine the Does' insurance coverage was consistent with its radio advertisements. At their second meeting with Shwed, Shwed allegedly told the Does that Anna Pfeiffer had determined that their insurance policy provided up to 2.5 million dollars for Jane's hospitalization. The Does testified that Harding's guarantee specifically induced them to allow Harding to begin the procedure for Jane's admission to Harding's long-term care facility known as "Stratford East."

Harding denies ever having asked for the policy as a condition of Jane's admission. Nevertheless, the testimonial accounts of the Does' clearly indicate that they, as well as Harding, conditioned Jane's admission to long-term care, initially estimated to cost $15,000 per month for at least six months, on the availability of adequate insurance coverage, and that Harding promised to find out if Jane had adequate insurance coverage.

Jane remained in Harding's South Berkley Facility for approximately thirty days until Harding fully developed a long-term treatment plan and until a bed was available at Stratford East. Blue Cross paid Harding for its inpatient emergency care of Jane, and it is undisputed that Mr. Doe's policy provided for payment of Jane's first thirty-one days of inpatient health care at Harding Hospital.

Jane's long-term treatment plan was executed by a team of Harding professionals who conducted weekly group evaluations of Jane's case. Jane's treatment plan required Mr. and Mrs. Doe to attend weekly family therapy sessions conducted by Harding's family therapist, Mary Griffith. The sessions began in mid-October 1988 and continued throughout Jane's eleven-month stay at Stratford East. Mrs. Doe testified that the subject of the extent of Jane's insurance coverage was frequently discussed as part of Griffith's routine update of Jane's weekly evaluation, and that Griffith assured them repeatedly that Jane's doctor was in constant communication with Blue Cross regarding payment for her treatment. The Does claim that they often confirmed through Griffith that Harding regularly received payment from Blue Cross. Pfeiffer acknowledged that there was no delinquency in appellant's account through April 1989.

On October 12, 1988, Mr. Doe personally visited Anna Pfeiffer for the purpose of obtaining a written confirmation of his insurance benefits. Pfeif-

fer correctly explained to Mr. Doe that it was not the business practice of most insurance companies, including Blue Cross, to issue written confirmations of a patient's coverage to medical providers. Thus, Pfeiffer offered to obtain another oral confirmation of Jane's benefits from Blue Cross. Pfeiffer testified according to her business records which indicate that she called Blue Cross on October 12, 1988. Pfeiffer admitted that she specifically asked Ms. Thurman if the 2.5 million dollar figure given Harding by her on September 15, 1988 was correct, and that Ms. Thurman responded to her that it was. There is conflicting testimony whether Pfeiffer had the policy in front of her during this conversation with Mr. Doe and Ms. Thurman. Blue Cross' records, as discussed in Ms. Thurman's deposition, again directly contradict Pfeiffer's testimony because they indicate a complete absence of provider inquiry calls to Thurman on October 12, 1988.

In short, the Does testified that, consistent with Harding's radio advertisements, they were continually reassured by Harding officials that Jane's treatment was paid entirely by Blue Cross and that they had nothing to worry about except the health of their child. Thus, they perceived no immediate need to ignore Harding's assurances and to call Blue Cross themselves to determine the coverage available.

According to Mrs. Doe, Mary Griffith was the first to mention, in May 1989, the nonpayment of Jane's hospital and professional services costs by Blue Cross since February 1989. Nevertheless, letters between appellant's attorney and Blue Cross, which were authenticated by affidavit, clearly proved that appellant was actually aware, as of January 31, 1989, despite the fact that Blue Cross was still paying Harding for Jane's care, that a discrepancy in the separate policy provisions regarding major medical hospitalization, versus inpatient mental health care, existed. Moreover, Harding's hospital biller noted the thirty-one-day limit on Jane's file on January 1, 1989, but Pfeiffer crossed it out and wrote "incorrect" next to the notation.

Furthermore, the letter from Blue Cross to appellant's counsel, dated February 22, 1989, assured appellant that Blue Cross considered its liability for Jane's inpatient mental health care at Harding to be limited to thirty-one-days per year. Finally, on March 24, 1989, Blue Cross informed appellant's attorney that it would discontinue payments to Harding and seek a reimbursement of all payments it made in excess of the thirty-one-day per year limitation. Consequently, Harding billed appellant directly for all past and future services received by Jane in excess of the thirty-one-day per year limit in the Does' policy pursuant to the financial responsibility statement signed by John Doe on September 15, 1988. Appellant instigated this lawsuit against

Harding and Blue Cross to avoid individual liability for Jane's unpaid medical costs.

From the inception of this litigation, estoppel has been the primary theory advanced by appellant in support of his complaint against Harding. Thus, we will first discuss appellant's second assignment of error, which squarely presents the issue whether the trial court correctly applied the principles of estoppel in this case to grant summary judgment for Harding.

The trial court rejected appellant's claim that Harding was estopped by its alleged misrepresentations of the extent of Jane's insurance benefits from assessing appellant the total cost of Jane's past and future medical expenses. The court relied on the case of *Pedler v. Aetna Life Ins. Co.* (1986), 23 Ohio St.3d 7, 23 OBR 6, 490 N.E.2d 605, which conditions application of the doctrine of equitable estoppel against an insurance company on the insured's ignorance of the true extent of his benefits and on the absence of any convenient available means of his ascertaining them.

In *Pedler, supra,* the insured's employer provided him $50,000 life insurance coverage. The insured received an insurance booklet explaining his insurance coverage and a plan summary which outlined various options available under the insurance policy. One of the options outlined in the plan summary and contained in the master life insurance contract allowed employees with two years of service to purchase additional supplemental coverage at their own expense. Both the plan summaries and master contract clearly stated that an employee was eligible for supplemental coverage only if the employee had completed two full years of employment. Nevertheless, the insured purchased supplemental coverage, evidenced by a certificate of insurance, after only two months of employment. The insured died within his first year of employment. The insurance company denied the beneficiary's claim for supplemental benefits due to the insured's ineligibility for coverage. The beneficiary sued the insurance company for those benefits on the theory of equitable estoppel.

The Supreme Court affirmed the denial of the beneficiary's claim and held that an insurer is estopped from denying the full value of coverage stated on the insurance certificate, based upon limitations or exclusions contained in the master policy, where the insured bargained and paid for such coverage, unless the insured knew or should have known of his ineligibility. Moreover, the court conditioned the application of the doctrine of equitable estoppel on the absence of any convenient available means from which the claimant could acquire the true extent of coverage if he lacked personal knowledge of it. In *Pedler*, the court considered the insurance booklet, plan summary, and the certificate of insurance alternative means by which the insured could have

obtained knowledge of the limitation on the availability of supplemental coverage. Thus, the court concluded that the failure of the insured to specifically note the limitation was not sufficient to estop the denial of coverage by the insurance company.

In the instant case, the trial court decided, as a matter of law, that appellant could not recover on an equitable estoppel theory due to his failure to prove good faith reliance on Harding's alleged misstatements. Specifically, the court found that appellant had actual knowledge of Jane's limited coverage under the policy due to his status as a small business owner, as well as his wife's experience as a clinical social worker. Moreover, the court found that the policy itself was an available alternative means from which appellant had constructive notice that his daughter's insurance coverage for inpatient mental health care is limited to thirty-one days per year.

We disagree with the trial court that *Pedler, supra,* is determinative of this case. First, the focus of this appeal is appellant's estoppel claim against the medical provider, not the insurance company. The dispute at this level is limited to whether appellant created material questions of fact that his reliance on Harding's representations were reasonable and in good faith. The trial court concluded that appellant could not prove any justifiable reliance on Harding's statements because his insurance contract clearly limited Jane's coverage for all costs associated with her inpatient care at Harding to thirty-one days per year.

A prima facie case for equitable estoppel requires a plaintiff to prove four elements: (1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) induces actual reliance which is reasonable and in good faith; and (4) which causes detriment to the relying party. *First Fed. S. & L. Assn. v. Perry's Landing, Inc.* (1983), 11 Ohio App.3d 135, at 145, 11 OBR 215, at 227, 463 N.E.2d 636, at 648. In assessing these four elements in the context of a particular case, relevant factors include:

" * * * [ (a) ] the nature of the representation; (b) whether the representation was in fact misleading; (c) the relative knowledge and experience of the parties; (d) whether the representation was made with the intent that it be relied upon; and (e) the reasonableness and good faith of the reliance, given all the facts and circumstances." *Id.*

To determine whether appellant's reliance on Harding's alleged or possible misrepresentations was unreasonable as a matter of law under his set of facts, we must initially ascertain which misrepresentations he claims to have relied upon.

In his first amended complaint, appellant alleged his reliance was on Harding's representations to him that Blue Cross told it that the 2.5 million dollar lifetime limit would cover all medical expenses incurred by Jane at Harding. This allegation would not, in itself, be sufficient to estop Harding from enforcing its services contract against appellant. The first confirmation of Jane's benefits was in the form letter prepared by Janet Porter. The letter specifically stated that it contained merely a verbal confirmation of the information provided by the insurance company and was not a guarantee of payment. Moreover, the letter contained a financial responsibility statement which appellant signed. The disclaimer and financial responsibility would render any continued reliance on the amounts stated therein unreasonable, absent further misrepresentations.

However, the verbal confirmation of benefits which appellant received from Pfeiffer in October 1988 was allegedly the result of a phone call to Blue Cross made by Pfeiffer in appellant's presence. According to Blue Cross, the correct information about coverage was provided to Harding (and miscommunicated to appellant, if appellant's testimony is credible). Obviously, appellant relied (if there were reliance) upon Pfeiffer's statement that Blue Cross affirmed that there was coverage, rather than upon what Blue Cross told Pfeiffer since appellant did not hear that conversation.

Appellant's contention that Harding's radio advertisements contained factual misrepresentations, which provided some inducement to admit Jane to Harding, is without merit. The ads merely say that Harding will help its patients find out their insurance benefits. Thus, the ads themselves are not false misrepresentations of anything. Moreover, Mary Doe testified that the ads were not a deciding factor in her choosing Harding. Jane Doe was taken to Harding from St. Anthony Hospital upon a recommendation to Mary from Jane's pediatrician. The ads do, however, support appellant's statements that coverage information was obtained by and provided to appellant by Harding.

Appellant's estoppel argument is primarily based on his reliance on Harding's cumulative assurances and guarantees of Jane's extended coverage that caused him to forgo personal contact with Blue Cross prior to Jane's admittance to Stratford East in late October 1988. Appellant's evidence is that he, as well as Harding, conditioned Jane's admittance to Stratford East on the availability of adequate insurance coverage. Appellant specifically claims that Shwed requested that he deliver a copy of his insurance policy to Pfeiffer to ascertain the extent of coverage available for Jane's treatment. Subsequently, the Does contend that Harding's assurance that the benefits existed induced the Does to admit Jane to Stratford East. Moreover, appellant contends that Harding's continued assurances caused him to forgo

contacting Blue Cross himself. Finally, Mary Doe testified that she, in fact, did read the insurance policy and decided that it did not contradict anything Harding had previously told her.

Since we are reviewing a summary judgment, we must accept as a fact for purposes of reviewing the summary judgment that Harding acted as appellant averred even though Harding denies those facts. Appellant's main claim is that Harding promised to determine Jane's benefits as a condition of her admission to Stratford East and that they did so, relating that Blue Cross stated that there was coverage after an employee personally checked the policy and confirmed coverage with Blue Cross. The misrepresentations alleged were the facts of coverage and not just promissory.

■ Reliance is also a necessary element of estoppel, which reliance must be reasonable and made in good faith.

■ Material factual questions exist from the conflicting evidence of the substance of the communications between Harding and appellant. Whether Harding promised the Does, subsequent to September 15, 1988 and in contemplation of Jane's transfer to Stratford East, to determine the extent of Jane's insurance coverage as a prerequisite to her admittance to long-term inpatient care is a question to be answered by the trier of fact. Likewise, whether Harding requested a copy of appellant's insurance policy for its officials to review, and thereby was estopped from applying the provision in its services contract which disclaimed its liability for any errors contained in its confirmations of Jane's extended coverage subsequent to its receipt of the policy, are questions which render summary judgment inappropriate. Finally, whether it was foreseeable that Harding's promise would cause the Does to forgo personal contact with Blue Cross, or closer scrutiny by them, or an independent adviser to determine the extent of coverage, is a question for the trier of fact. The financial responsibility statements signed by appellant would not necessarily defeat application of the doctrine of estoppel because their terms do not contain a merger clause or any other limitation on Harding regarding a subsequent promise to appellant to help determine the extent of Jane's benefits as a condition of her admission to Stratford East.

■ The factual misstatement upon which appellant primarily relies to attach liability against Harding on the theory of estoppel is that Harding had itself determined and represented to appellant that Jane actually had 2.5 million dollars of available insurance coverage for her stay at Stratford East,

despite allegedly contrary information provided by Thurman at Blue Cross.[3] This confirmation was allegedly made many times subsequent to the letter of September 15, 1988 by Jane's treating physician through Mary Griffith. Harding's continual reassurances, combined with Mary Griffith's guarantee that the Does had nothing to worry about except the health of their child, if proved, are sufficient to present a genuine issue of fact that appellant's reliance was reasonable.

■ The policy provisions herein are not so easily determined from reading the policy as to render any reliance on false statements that there was coverage beyond thirty-one days unenforceable under the *Pedler* doctrine. Harding was or should have been aware that the Does would rely on their statement that Jane had adequate insurance coverage, particularly since a Harding employee allegedly conveyed that message to appellant while in possession of the policy and after talking privately to Blue Cross. It is also significant that the Does specifically told Harding that they could not afford to admit Jane to Stratford East unless there was adequate insurance coverage. Therefore, Harding's alleged statements were made with the intent that they be relied upon. The experience or knowledge of appellant in insurance matters was not sufficient to defeat reliance as a matter of law. Doe's experience is only a factor to be considered by the trier of the fact. Balanced against that experience is the traumatic situation faced by the Does and their claimed reliance upon Harding to assist them in obtaining correct information about coverage.

■ The trial court also found that appellant's reliance on any of Harding's statements was unreasonable because appellant actually knew from his attorney's correspondence with Blue Cross that Jane's inpatient mental health care coverage was limited to thirty-one days per year. The letters reveal that February 22, 1989 was the pivotal date from which appellant had

---

3. Technically, there has not been a final judgment which resolves the issue of whether Jane's inpatient medical treatment at Harding was limited to thirty-one days per year, or whether another portion of the policy would provide extended coverage, at least for room and board. Since this is the primary issue in appellant's breach of contract claim against Blue Cross pending at the common pleas court (see footnote 1), Civ.R. 54(B) most likely should have prevented the trial court from rendering final judgment for Harding prior to reaching a judgment on appellant's claim against Blue Cross. Nevertheless, the trial court's decision of April 18, 1991 interpreted the insurance contract against appellant. The trial court specifically concluded that the policy provided for only thirty-one days of inpatient mental health care, including room and board, per year. Thus, a factual statement that Jane was covered up to 2.5 million dollars for her stay at Harding would be false for purposes of the first element of appellant's claim of equitable estoppel. Since that determination, even if correct, has not been made binding in the claim against Blue Cross, it should not be held to be found in favor of Harding as that issue should be appealed at a time when all parties would be equally affected.

actual knowledge that Blue Cross had denied Jane's coverage and would seek a reimbursement of medical expenses paid in excess of the thirty-one-day per year limit from Harding. Appellant, however, does not claim that he relied on any statements made by Harding after 1988 in deciding whether to admit Jane to long-term care. Appellant does argue, however, that, when he finally knew that Blue Cross denied coverage for Jane's treatment at Stratford East and would seek reimbursement, Jane's condition was such that it made it impossible for him to remove Jane from Harding and to place her in a less expensive facility.. Thus, the letters raise only an issue of the extent of damages rather than of liability, since costs beyond thirty-one days had already been incurred at that time.

Having determined that appellant's evidence is sufficient to raise genuine issues of facts making possible a recovery by appellant against Harding based upon estoppel, we hereby sustain appellant's second assignment of error.

Appellant's first assignment of error addresses the trial court's summary judgment for Harding on appellant's alternative negligence claim. John Doe's complaint based Harding's alleged negligence on its misrepresentation of Jane's insurance benefits. Nevertheless, appellant's memoranda contra to Harding's motion for summary judgment failed to cite any case which discussed the tort of negligent misrepresentation. Rather, appellant argued that Harding breached an "assumed duty" to correctly interpret appellant's insurance policy for him.

The trial court denied appellant's alternative negligence claim because it concluded, as a matter of law, that any duty to correctly interpret an insurance policy must derive from the insurance contract itself. The trial court specifically stated that the lack of contractual privity between appellant and Harding, as far as the insurance policy was concerned, prevented a finding that Harding breached a duty to correctly interpret the policy.

On appeal, however, appellant's opposition to the trial court's summary judgment is confined to an analysis of 3 Restatement of the Law 2d, Torts (1987) 126, Section 552 (hereafter "Section 552"), which defines the tort of negligent misrepresentation as follows:

"§ 552. Information Negligently Supplied for the Guidance of Others

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

The alternative facts of this case must be considered before it can be determined whether negligent misrepresentation is a viable theory for relief. First, if Harding made no statements that Blue Cross confirmed long-term coverage, there was no misrepresentation, negligent or otherwise. Second, if Harding accurately relayed the statement of Blue Cross that there was coverage, there was no misrepresentation and the party that could be estopped was Blue Cross. Third, if Blue Cross told Harding's employees that there was no long-term coverage and Harding miscommunicated that information to appellant, Harding could be estopped, as explained previously. It would not matter whether the misrepresentation was negligent or not. The same requirement of reliance is applicable in any event. Thus, inserting the doctrine of negligent misrepresentation will add nothing and only potentially cloud the issues in the case.

■ Appellant argues, however, that Harding is liable under Section 552 for its own misrepresentations to the Does. Those misrepresentations were allegedly contained in its advertisements which promised that Harding would help its patients find out how much they could count on their medical benefits. Again, we reject appellant's arguments that the ads were deceptive or contained any false guarantee that Harding would unilaterally ascertain the availability of insurance benefits. Thus, no liability can result from the radio ads.

More important, appellant's first assignment of error is focused on his argument that Harding is liable for negligent misrepresentation based on its "assumption of duty" to interpret appellant's insurance contract. The duty element in Section 552 is to use reasonable care in obtaining and communicating information in a business setting, whether done gratuitously or not. Appellant's "assumption of duty" theory to establish negligence liability in this case is misplaced. Appellant is really asserting that Harding promised to find out from Blue Cross the extent of Jane's benefits as a condition of her transfer to Stratford East. There was no reliance upon the ads as a guarantee to interpret the policy and appellant's allegations make clear that

the information to be relied upon was to come from Blue Cross, not Harding's unilateral interpretation of the policy.

Appellant's first assignment of error is overruled.

Appellant's third assignment of error challenges the trial court's summary judgment for Harding on its counterclaim against appellant for his alleged breach of contract for failure to pay Jane's medical expenses.

For the reasons previously discussed, we find that appellant presented genuine issues of fact whether Harding is estopped from enforcing its services contract against appellant, either in part or in whole.

Appellant's third assignment of error is sustained.

Appellant's first assignment of error is overruled. Appellant's second and third assignments of error are sustained. The judgment of the trial court is reversed and the case is remanded to the trial court for further procedure consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BOWMAN and STRAUSBAUGH, JJ., concur.

DEAN STRAUSBAUGH, J., retired, of the Tenth Appellate District, sitting and hearing the appeal pursuant to active duty prior to his retirement, and assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution, subsequent to his retirement.