[Cite as *Reid v. Wallaby's Inc.*, 2012-Ohio-1437.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE   COUNTY

| | | |
|---|---|---|
| MARILYN REID | : | |
| | : | Appellate Case No. 2011-CA-36 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 2009-CV-0774 |
| v. | : | |
| | : | (Civil Appeal from |
| WALLABY'S INC., et al. | : | Common Pleas Court) |
| | : | |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30ᵗʰ day of March, 2012.

. . . . . . . . . . .

JOHN D. SMITH, Atty. Reg. #0018138, John D. Smith Co. LPA, 140 North Main Street, Springboro, Ohio 45066
        Attorney for Plaintiff-Appellant

BENJAMIN J. HELWIG, Atty. Reg. #0079184, Taft Stettinius & Hollister LLP, 40 North Main Street, Suite 1700, Dayton, Ohio 45423
        Attorney for Defendants-Appellees

. . . . . . . . . . . . .

FAIN, J.

## I.   Introduction

{¶ 1}    Plaintiff-appellant Marilyn Reid appeals from a judgment rejecting her claims against Defendants-appellees Tony Peh and Wallaby's Inc., following a bench trial.

Reid contends that the trial court erred in failing to render a verdict related to Wallaby's. Reid further contends that the trial court erred in holding that the doctrines of unclean hands, laches, and accord and satisfaction warrant judgment in favor of the defendants.

{¶ 2}    We conclude that the trial court erred in failing to properly render a verdict against Wallaby's.  We further conclude that the trial court erred in applying the doctrine of unclean hands, because that defense was not raised in the answers that were filed.  The trial court did not err in considering laches, which was tried by implied agreement, but the evidence does not justify a finding of laches on Reid's part.  The trial court also erred in applying the doctrine of accord and satisfaction, which was raised in the answers.

{¶ 3}    Finally, we conclude that the doctrine of estoppel, which was properly raised and argued in the trial court, does not preclude recovery by Reid against Wallaby's and Peh. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.


## II.  Facts

{¶ 4}    Marilyn Reid and Tony Peh became acquainted through Peh's junior high and high school friendship with Reid's son, David.  Peh and David Reid had been very close friends.  Around 1994, Peh came up with the idea of starting a restaurant in Beavercreek, Ohio.  This occurred after Peh had launched a successful restaurant project called Shades of Jade.  Peh had already begun to move forward with the Beavercreek project, and the location was already chosen – the land had been purchased by Peh's father, Dr. Peh.  Reid expressed interest in the project, and a corporation, Wallaby's Inc., was formed, with the following shares:  Tony Peh was the majority shareholder, with 65%; Marilyn Reid owned 5%; Nelson

Reid, Marilyn's son, owned 5%; Peh's uncle, Wang Chao Chung, owned 5%; Mike Buckwalter owned 5%; David Reid, Marilyn's ex-husband, owned 10%; and Anita Lehman, the wife of the builder, Rich Leman, owned 5%.

{¶ 5} Due to construction cost overruns, there was not enough capital left to purchase kitchen equipment. Peh approached a kitchen leasing company about equipment, and received their standard lease form for the equipment he had selected. Because the leasing company required that someone other than Peh be the surety, Peh took the lease agreement to Marilyn Reid. Reid erased the name of the equipment leasing agent on the form, and inserted her own name as the leasing agent. She also erased her own name, which had been on the lease as the surety, and inserted Peh's name. Reid then paid $100,000 to purchase the equipment, which was placed in the restaurant. Both Peh and Reid signed the lease agreement, with Peh signing on behalf of Wallaby's and as surety.

{¶ 6} The lease provided for 36 payments of $3,519.64, plus applicable sales tax, beginning in March 1996, and ending in March 1999. In addition, the lease stated that the first and last month's payments, plus a $100 documentation fee, were to be paid at the inception of the lease, with total lease payments, including interest, to be $126,707.04. The monthly payments were due upon receipt of a statement, and the lessee had the option to purchase the equipment at the end of the lease for $1.00.

{¶ 7} After the lease was signed, no statements or invoices for the equipment rental were ever sent to Wallaby's bookkeeper, Debra Sullivan, who worked at Wallaby's between 1996 and 2006, or to Peh or his wife, Renee, who also managed Wallaby's for quite some time. No payments were ever made on the lease,

{¶ 8}     The evidence was disputed with regard to whether Reid ever made a demand for payment.  Reid testified on this point as follows.  Peh told Reid in July 1999, that he wanted to quit the business, and asked Reid to call a meeting of stockholders.  Reid, who was the acting secretary of Wallaby's, sent out notices for an August 25, 1999 shareholder's meeting.  Two days before the meeting, Reid handed Peh a list of things that the company needed to do try to do (identified as Plaintiff's Exhibit 2 at trial).  Reid also handed Peh a written demand for payment on the equipment lease (identified as Plaintiff's Exhibit 3 at trial).  According to Reid, the  lease was discussed at the meeting on August 25, and Peh agreed to make arrangements to satisfy the lease obligation.  Reid claimed this was documented in the minutes of the meeting that she had typed.  She also stressed that when she referred to Peh making payment, that she was referring only to Wallaby's, not to Peh.

{¶ 9}     In contrast, Peh testified that he never told Reid he wanted to quit.  He told her only that he was tired, because the restaurant business is a long, grueling job.  He acknowledged receiving Exhibit 2 (the list of items) a few days before the August 25 meeting, but denied that he had ever received Exhibit 3 (the written demand).  Peh brought an attorney, Carolyn Mueller, to the August 25 meeting.  He acknowledged that the equipment lease was discussed during the meeting, but stated that this was in the context of discussing all of Wallaby's outstanding debts.  Peh denied that a demand for payment was made at the meeting, and denied agreeing to make arrangements to satisfy the equipment lease.

{¶ 10}     Mueller testified at trial, and stated that Peh had called her on August 24, 1999.  He had just received notice of a meeting,  was very upset, and was afraid they were going to put the business in receivership.  Peh sent Mueller documents, but there was nothing that asked for payment on an equipment lease.  Mueller attended the meeting on August 25,

1999, and took some notes. The meeting consisted mainly of bickering going back and forth about construction documents and not receiving things. Everyone was just kind of angry. Reid mentioned a lease, and Mueller asked if she had any documents, but Reid had none. Reid did not demand payment on the equipment lease at the meeting.

{¶ 11} The Wallaby's property was listed with a realtor at the time of the August 1999 shareholders' meetings. Thereafter, the property was listed off and on with different realtors. After August 1999, Peh did not make payments on the equipment lease, and Reid did not send written statements or invoices, nor did she make written demands for payment. Reid did turn in receipts for many other purchases she made for Wallaby's, like tables and decorations, and was paid by Wallaby's bookkeeper for these items. Reid had also been paid in full for expenses she incurred in obtaining a liquor license for Sunday sales.

{¶ 12} Concerning why the lease payments were not made, Peh stated that when Wallaby's first opened in 1996, it was very busy, as all new places are. Turning a profit in the beginning was difficult, because of the number of staff that had to be trained. After the "honeymoon" period, things died down, and the business did not do as well. Money was coming into the restaurant, but Peh had to pick and choose what bills to pay. Peh found out from reviews that Wallaby's was not very aesthetically appealing to people – people said that it looked like a bomb shelter. Wallaby's remained in business until 2007, more than ten years after the equipment lease was signed. During that time, Peh spent around $100,000 remodeling, trying to make the restaurant look better. He added tile floors, walls, and wood on the walls. If Reid had made demand for payment during this time, Peh would have made other choices of what to pay, and would have paid on the equipment lease, rather than spending money on remodeling and paying other bills. Based on discussions with Reid, Peh

was under the impression that Reid was relying on the equity in the building to get her money back. Reid also acknowledged at trial that the collateral may have depreciated over the time the restaurant was in operation.

{¶ 13} Unfortunately, Wallaby's never became profitable, and the restaurant stopped serving food in 2006, or early 2007. The bar side, which was called "The Gin Mill," remained open, because it would be easier to sell Wallaby's if it still had a liquor license and appeared to be a going concern.

{¶ 14} Reid testified that she learned in January 2007, while having lunch at Wallaby's, that Wallaby's was going to stop selling food on the restaurant side. Reid stated that she realized then that she was unlikely to be paid by Wallaby's for the lease. Consequently, Reid prepared a mortgage on the Wallaby's real estate for $100,000 plus interest, and filed the mortgage on January 17, 2007, with the Greene County Recorder. Peh signed the mortgage after being told by Reid that she was entitled under the lease to a mortgage.

{¶ 15} Previously, on January 4, 2007, the Ohio Secretary of State had sent a letter to Nelson Reid, Wallaby's statutory agent, indicating that Wallaby's articles of incorporation had been cancelled, based on Wallaby's failure to pay the necessary corporate franchise tax. The letter was addressed to Nelson Reid at the law offices of Marilyn Reid, but Marilyn Reid claimed that she was not aware of the letter at the time the mortgage was signed. Reid understood that the building was going to be put up for sale, and she wanted to get in line and record a mortgage, because the building had a lot of equity. At one point, the building was appraised at $2,000,000, and the tax appraisal was $1,480,000.

**{¶ 16}** In January 2007, Reid also prepared and filed a UCC financing statement with the Secretary of State regarding the leased equipment. Mortgages securing debt to other Wallaby's shareholders, including Reid (but not including Tony Peh), were also placed on the property in mid-January 2007.

**{¶ 17}** In July 2007, there was a kitchen fire at Wallaby's, and some of the equipment was damaged. The Health Department required removal of the cooking equipment from the building. Reid was informed, but did not remove the collateral; instead, Wallaby's paid for storage of the equipment.

**{¶ 18}** In April 2008, the Greene County Treasurer filed a foreclosure action against Wallaby's, alleging that Wallaby's owed $91,570.56 in unpaid property taxes as of April 30, 2008. Various mortgage holders, including Reid, were included in the suit. Subsequently, in July 2009, Reid filed suit against Wallaby's and Peh, contending that they owed her $636,116.37 under the 1999 equipment lease. In September 2009, the trial court rendered summary judgment and foreclosure against Wallaby's, listing Reid's mortgage for the equipment as seventh in line, after various mortgages, but ahead of federal tax liens in the amounts of $20,680.20 and $19,031.26 that had been filed on January 31, 2007, and June 8, 2007, respectively.

**{¶ 19}** Reid's complaint against Wallaby's and Peh was consolidated with the foreclosure action in November 1999. In July 2010, the restaurant was sold at a sheriff's sale for $813,350, and the proceeds were distributed in September 2010. The Greene County Treasurer received $262,656.96 in unpaid taxes, court costs of $1,916.62 were paid, and Huntington National Bank received $316,935.41. The remaining $231,841.01 was to be

disbursed to the remaining lienholders, but the amount left was insufficient to provide recovery to Reid for the equipment lease. Reid was granted permission in November 2010, to remove the leased equipment from the premises.

{¶ 20} After overruling cross-motions for summary judgment, the trial court held a bench trial in May 2011. The trial court concluded that Reid was not entitled to recover, based on equitable doctrines, including laches, accord and satisfaction, and unclean hands. Among other things, the trial court relied on the fact that no demand had been made on Peh, as surety, between 1999 and 2009, to pay the outstanding lease balance. The court further held that Reid's taking of a mortgage in January 2007, against Wallaby's real estate, a then-viable asset, was in satisfaction of Wallaby's debt to Reid. Reid appeals from the judgment rendered by the trial court.

## II. Did the Trial Court Fail to Render a Verdict as to Wallaby's?

{¶ 21} Reid's First Assignment of Error is as follows:

THE TRIAL COURT ERRED IN FAILING TO RENDER A VERDICT RELATED TO LESSEE.

{¶ 22} Under this assignment of error, Reid contends that the trial court erred in failing to enter a verdict related to Wallaby's, the lessee on the lease. Reid notes that the judgment entry states only that "The court finds Verdict for Defendant, Tony Peh, individually, and against Plaintiff." Peh argues that the assignment of error is without merit, because the trial court referred to Wallaby's and Peh interchangeably throughout its judgment entry.

{¶ 23}    The trial transcript clearly indicates that the bench trial was being held on Reid's claims against both Wallaby's and Peh.  See Trial Transcript, p. 3.  The trial court also stated in its verdict, issued after the trial, that "Plaintiff now sues Defendant Wallaby's Inc. and Tony Peh, individually, for $626,116.37."  Doc. # 59, May 31, 2011 Verdict, p. 2. The court concluded that Wallaby's debt had been satisfied by the mortgage granted to Reid in 2007, that laches applied to the claim against Peh, and that clean hands required a verdict for defendant.    At the end of the entry, the court made the statement on which Reid relies – rejecting a judgment individually against Peh.

In all civil cases appealed to this state's appellate courts, the trial court must prepare a journal entry or order containing the following: (1) the case caption and number; (2) a designation as a decision or judgment entry or both; (3) a clear pronouncement of the court's judgment and its rationale if the entry is combined with a decision or opinion; (4) the judge's signature; (5) a time stamp indicating the filing of the judgment with the clerk for journalization; and (6) where applicable, a Civ.R. 54(B) determination and Civ.R. 54(B) language.  *In Matter of Barton*, 2d Dist. Miami No. 96-CA-31, 1997 WL 189474, *2 (Apr. 18, 1997), citing *Brackmann Communications, Inc. v. Ritter*, 38 Ohio App.3d 107, 109, 526 N.E.2d 823 (12th Dist. 1987).

{¶ 24}    In the case before us, the entry contained all the above items, except a clear pronouncement of its judgment.  Although the court appears to have intended to reject the claims against both Wallaby's and Peh, the entry is somewhat ambiguous.  We conclude that this error can likely be corrected by a nunc pro tunc judgment, but the matter needs to be resolved, even though Wallaby's is a defunct corporation with no assets.

{¶ 25}    The First Assignment of Error is sustained.

### III.   Did the Trial Court Err in Applying Equitable Doctrines?

{¶ 26}    Because the remaining assignments of error all deal with equitable doctrines, we will combine our discussion of these alleged errors.   The Second, Third, and Fourth Assignments of Error are as follows:

THE TRIAL COURT ERRED IN HOLDING THAT THE DOCTRINE

OF UNCLEAN HANDS WARRANTS JUDGMENT IN FAVOR OF LESSEE

AND PEH ON APPELLANT'S CLAIMS.

THE TRIAL COURT ERRED IN HOLDING THAT THE DOCTRINE

OF LACHES WARRANTS JUDGMENT IN FAVOR OF LESSEE AND PEH

ON APPELLANT'S CLAIMS.

THE TRIAL COURT ERRED IN HOLDING THAT THE DOCTRINE

OF ACCORD AND SATISFACTION WARRANTS JUDGMENT IN FAVOR

OF LESSEE AND PEH ON APPELLANT'S CLAIMS.

{¶ 27}    Under these assignments of error, Reid argues that the doctrines of unclean hands and laches were waived because they were not asserted as affirmative defenses in the answers filed by Wallaby's and Peh.   Reid further argues that "unclean hands" is an equitable defense that does not apply to a contract setting.   Finally, Reid contends that the evidence at trial did not establish any of these defenses.

### A.   Alleged Waiver of Affirmative Defenses

{¶ 28}    Civ. R. 8(C) requires parties to set forth affirmative defenses like estoppel,

laches, accord and satisfaction, and waiver, in pleading to a preceding pleading. Wallaby's and Peh raised the affirmative defenses of accord and satisfaction, waiver, and estoppel in their answers, but did not assert laches or unclean hands. Wallaby's and Peh contend, however, that the trial court had the ability to consider these matters based on its equitable power and the permissible construct in the Civil Rules that allows amendment of pleadings to promote justice.

{¶ 29}  Civ. R. 15(B) provides that;

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. Failure to amend as provided herein does not affect the result of the trial of these issues.

An implied amendment of the pleadings under Civ.R. 15(B) will not be permitted where it results in substantial prejudice to a party. Various factors to be considered in determining whether the parties impliedly consented to litigate an issue include: whether they recognized that an unpleaded issue entered the case; whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be tried on a different theory; and, whether the witnesses were subjected to extensive cross-examination on the issue. *State ex rel. Evans v. Bainbridge Tp. Trustees,* 5 Ohio St.3d 41, 41-42, 448 N.E.2d 1159 (1983).

{¶ 30}  In the case before us, Wallaby's and Peh did raise the defense of laches in

their motion for summary judgment. See Doc. #37, p. 5. When Reid responded to the motion for summary judgment, she acknowledged that the issue of laches had been raised, and did not object to the fact that the defense had not been asserted in the answers to the complaint. See Doc. # 38, pp. 1-2. In addition, laches was discussed at trial, the witnesses were cross-examined on the subject, and the issue was addressed during closing arguments. As Wallaby's and Peh note, the gist of the case concerned the delay in filing the claim and the alleged prejudice that had been caused by the delay. Accordingly, we conclude that the trial court did not err in considering the defense of laches.

{¶ 31} Unlike laches, however, the doctrine of "unclean hands" was not asserted prior to trial. "The 'clean hands doctrine' of equity requires that whenever a party takes the initiative to set in motion the judicial machinery to obtain some remedy but has violated good faith by his prior-related conduct, the court will deny the remedy." *Marinaro v. Major Indoor Soccer League*, 81 Ohio App.3d 42, 45, 610 N.E.2d 450 (9th Dist. 1991) (citation omitted). This doctrine does not apply, however, where a party is not attempting to invoke the equitable powers of the court. *See, e.g.*, *Jamestown Village Condo. Owners Assn. v. Market Media Research, Inc.*, 96 Ohio App.3d 678, 688, 645 N.E.2d 1265 (8th Dist.1994).

{¶ 32} Although the trial court may have been offended at Reid's actions, including her attempt to collect more than $600,000 on a lease that she had made no attempt to enforce for many, many years, Reid was not attempting to invoke the equitable powers of the trial court. Reid's action was contractual, to recover on the lease and against the surety. Consequently, even if the defendants had pled "unclean hands" as an affirmative defense, the doctrine would not have applied. This does not require that we reverse the judgment, however. The Supreme Court of Ohio has "consistently held that a reviewing court is not

authorized to reverse a correct judgment merely because erroneous reasons were assigned as the basis thereof." (Citation omitted.) *Joyce v. General Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990). Consequently, we will examine the remaining bases for the trial court's decision, to decide if the decision should be upheld.

### B. Did Peh Establish Laches?

{¶ 33} Reid contends that the evidence at trial did not establish the elements of the defense of laches. "The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for such a delay, (3) knowledge – actual or constructive – of the injury or wrong, and (4) prejudice to the other party." (Citation omitted.) *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm.*, 129 Ohio St.3d 485, 2011-Ohio-4189, 954 N.E.2d 104, ¶ 45.

{¶ 34} "The decision of a trial court concerning the application of the doctrine of laches will not be reversed on appeal in the absence of an abuse of discretion. An abuse of discretion is more than just an error in judgment, but rather implies that the court's attitude is unreasonable, arbitrary, or unconscionable." (Citations omitted.) *State ex rel. Donovan v. Zajac*, 125 Ohio App.3d 245, 250, 708 N.E.2d 254 (11th Dist.1998). The Ohio Supreme Court noted in *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), that most abuses of discretion result in decisions that are unreasonable, rather than arbitrary or unconscionable. A decision is unreasonable if it lacks a sound reasoning process. *Id.* Accordingly, our task is to decide if the trial court acted unreasonably, arbitrarily or unconscionably in applying laches to Reid's claims.

{¶ 35} In support of her position, Reid relies primarily on *Thirty-Four Corp. v. Sixty-Seven Corp.,* 15 Ohio St.3d 350, 474 N.E.2d 295 (1984). In *Thirty-Four Corp.*, a

father, who headed one corporation, signed a $200,000 note on behalf of the corporation, payable to a corporation owned by his son. The note bore six percent interest and was payable a year later. *Id*. at 351. The son waited almost fifteen years to file suit on the note, and the father's estate raised various affirmative defenses, including laches. *Id*. When the case reached the Supreme Court of Ohio, the court rejected the son's argument that laches could not apply where the case had been filed within the applicable statute of limitations. *Id*. The court held, instead, that "upon a clear showing of special circumstances, the defense of laches may be asserted prior to the expiration of the statute of limitations." *Id*. at 353.[1]

{¶ 36} In *Thirty-Four Corp*., the Supreme Court of Ohio concluded that the defense did not fit the facts of the case. Although the son's corporation had taken contradictory positions regarding the debt and had failed to make a timely demand, the court did not rely on these points, because the debt, note, and mortgage had been promptly recorded and the parties had actual notice of the terms. The court also rejected the idea that material prejudice was caused by the accumulation of interest and lack of timely demand, because the terms of the debt were established at the time of execution. *Id.* Regarding the nearly fifteen-year delay in filing suit, the court observed that:

> "Delay in asserting a right does not of itself constitute laches, and in order to successfully invoke the equitable doctrine of laches it must be shown that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting his claim." *Id.* at 354, quoting

---

[1] Reid makes the same argument here, in the context of asserting that allow-ing laches would to be applied would "eviscerate" her right to bring a contractual action within the statutory time period. If this were correct, the Supreme Court of Ohio would have rejected any application of laches in *Thirty-Four Corp*.

*Smith v. Smith*, 168 Ohio St. 447, 156 N.E.2d 113 (1959), paragraph three of the syllabus.

"Material prejudice" consists of "two types of material prejudice, either of which necessitate the application of laches: (1) the loss of evidence helpful to the defendant's case, and (2) a change in the defendant's position that would not have occurred had the plaintiff not delayed in asserting her rights." (Citation omitted.) *Zajac*, 125 Ohio App.3d at 250, 708 N.E.2d 254.

{¶ 37} In the case before us, the trial court observed that Reid never made a demand on Peh to pay as surety until she filed this action in 2009. This was a delay of more than thirteen years. While the accrued interest and failure to make a timely demand, alone, would not have constituted material prejudice under *Thirty Four Corp.*, Peh contends that there are additional factors here that meet the requirement of a change in position that would not have occurred if Reid had not delayed asserting her rights. Peh mentions the fact that he would have paid Reid as he did other creditors, and as he did Reid, herself on other bills, during the time when Wallaby's was earning income.

{¶ 38} We disagree with Peh's contentions. The lease requires repayment of the debt, and Peh was aware of the amount and the obligation, having signed the agreement on behalf of the lessee and as the surety. Peh also would have been aware of the following language in the lease agreement:

15.03 No covenant or condition of this Lease may be waived except by the written consent of the Lessor. Forbearance or indulgence by the Lessor in any regard whatsoever shall not constitute a waiver of the covenant or condition to be performed by the Lessee to which the same may apply, and

until complete performance by the Lessee of any covenant or condition, the Lessor shall be entitled to invoke any remedy available to the Lessor under this lease or by law or in equity despite said forbearance or indulgence.

**{¶ 39}** In support of a rejection of laches, Reid also argues that it cannot apply to actions for breach of contract. However, this is inconsistent with the decision of the Supreme Court of Ohio in *Thirty Four Corp.*, which involved a foreclosure suit on a promissory note and mortgage – both of which are contractual matters. *Id.*, 15 Ohio St.3d at 351, 474 N.E.2d 295. Although the Supreme Court of Ohio ultimately decided that the defendant's facts failed to satisfy the requirements for laches, the court did not preclude the claim on the basis that the action involved a contract.

**{¶ 40}** Finally, Reid argues that applying laches would contravene the language of Section 15.03 of the lease agreement, which we just recited. We agree with Reid. Again, when Peh signed the lease on behalf of Wallaby's, and as surety, he would have been aware of the content of the lease.

**{¶ 41}** Accordingly, there was no material prejudice to support the application of the doctrine of laches. The trial court, therefore, abused its discretion when it applied the doctrine of laches to bar Reid's claim against Peh.

### C. Did Defendants Establish Accord and Satisfaction?

**{¶ 42}** Reid's final argument is that the trial court erred both legally and factually in concluding that an accord and satisfaction occurred. The trial court noted that the case did not fit neatly into the defense of accord and satisfaction, but concluded that principles of equity required a finding of accord and satisfaction. The court noted that Reid was given a

mortgage for $100,000 plus interest against the real property of Wallaby's, at a time when the enterprise was still viable. The court concluded that this was in satisfaction of Wallaby's debt to Reid.

{¶ 43} "An accord is a contract between a debtor and a creditor in which the creditor's claim is settled in exchange for a sum of money other than that which is allegedly due. Satisfaction is the performance of that contract." *Allen v. R.G. Indus. Supply*, 66 Ohio St.3d 229, 231, 611 N.E.2d 794 (1993).

> When an accord and satisfaction is pled by the defendant, the court's analysis must be divided into three distinct inquiries. First, the defendant must show that the parties went through a process of offer and acceptance – an accord. Second, the accord must have been carried out – a satisfaction. Third, if there was an accord and satisfaction, it must have been supported by consideration. *Id.* at 231-232. (Citation omitted.)

{¶ 44} Reid contends that the mortgage could not have been in satisfaction of the debt, because the lease provided that a mortgage on the real estate would serve as additional collateral. Therefore, no consideration existed. Reid also contends that the mortgage cannot serve as the "new contract" required for purposes of accord and satisfaction, because she did not sign the mortgage.

{¶ 45} The lease gives the lessor certain remedies upon default, like suing for the balance due, after providing written notice of default, or repossessing the equipment. Plaintiff's Exhibit 1, Section 3.03. Consistent with Reid's contention, however, the lease also provides for a lien on the property. In this regard, Sentence 5 of the terms states that the contract is a "finance lease." Sentence 6 grants the lessor a purchase money security interest

in the equipment. The items of equipment are then listed. Finally, following the list of equipment, the following statement appears:

> Additional collateral will be lien filed on the Real Property situated in Section 5, Town 2, Range 7, M.R.S., City of Fairborn, Greene County, Ohio and being all of Lot No. 6967 as shown on a Record Plan of Wright Executive Park, Section Three as recorded on March 13, 1992 at Book 27, pages 28 & 29 in the Plat Records of Greene County.

**{¶ 46}** The intent of this provision is to allow the lessor to file a mortgage on the real property to protect its security interest. Peh's cooperation in signing a mortgage for a definite amount of $100,000 plus interest allowed Reid to protect her interest. However, Peh did only what Wallaby's was already required to do, under the express terms of the lease, so there was no additional consideration for his taking the action – executing a mortgage on the real property to secure the lease obligation – that he was already required to perform.

**{¶ 47}** With respect to Reid's second argument, Reid relies on Section 15.04 of the lease, which states that:

> This Lease constitutes the entire agreement between the Lessor and Lessee and supersedes any prior understandings or written or oral agreements between the parties respecting the subject matter. It shall not be amended, altered, or changed except by a written agreement signed by all parties hereto.

**{¶ 48}** In *Citibank (South Dakota), N.A. v. Perz*, 191 Ohio App.3d 575, 2010-Ohio-5890, 947 N.E.2d 191 (6 Dist.), the Sixth District Court of Appeals rejected the argument of a credit-card company that accord and satisfaction could not apply because the company had never accepted an offer of partial payment from its credit-card holder. Instead,

the company had simply cashed the checks that were offered in partial payment by the debtor's attorney, who offered to settle for a partial amount rather than having the client declare bankruptcy. *Id.* at ¶ 2-8. The Sixth District Court of Appeals observed that:

> As to appellee's argument that it never accepted appellant's offer, the Ohio Supreme Court made clear in *Allen* that the first two requirements are satisfied "when the creditor manifests acceptance of the offer by negotiating a check sent by the debtor with the offer." Moreover, contrary to the trial court's assertion, the lack of settlement discussions or other communications between the parties before appellant sent her letters does not preclude the occurrence of an accord and satisfaction. Thus, the only real question in this case is whether appellant's failure to show an actual dispute is fatal to her accord-and-satisfaction defense. (Citation omitted.) *Id.* at ¶ 43, quoting from *Allen,* 66 Ohio St.3d at 232, 611 N.E.2d 794.

{¶ 49} Accordingly, Reid's failure to sign the mortgage agreement is not fatal to the claim. The fact that Reid accepted the mortgage agreement and filed it to further her interest would have been sufficient, if consideration existed. Additionally, the lease in the case before us refers only to amendments or changes to the lease. An accord and satisfaction involves a new agreement, not an amendment. *See, e.g.*, *Somerset Synfuel No. 1, L.L.C. v. Resource Recovery Internatl. Corp.*, 188 Ohio App.3d 368, 2010-Ohio-3463, 935 N.E.2d 497, ¶ 34 (11th Dist.). Thus, Reid's signature was not required in order for a new agreement to be effective.

{¶ 50} The court in *Citibank* also rejected the credit-card company's argument that accord and satisfaction could not apply because the amount of the debt was not in dispute. In this regard, the court observed that:

It has long been recognized, however, that partial payment in lieu of filing bankruptcy is sufficient consideration for an accord and satisfaction, despite the lack of a bona fide dispute over the existence or amount of the debt. The right of an insolvent debtor to file bankruptcy and seek a discharge of the debt is a thing of significant value, and its relinquishment is more than what the debtor was already bound to do. Thus, courts have generally held that the element of a bona fide dispute in accord-and-satisfaction cases is obviated when a creditor accepts a partial payment tendered in full satisfaction of the debt knowing that the debtor is insolvent and contemplating bankruptcy. *Id.*, 191 Ohio App.3d 575, 2010-Ohio-5890, 947 N.E.2d 191, at ¶ 45.

{¶ 51} When Reid obtained the additional security on her debt, Wallaby's was not threatening to file bankruptcy. In addition, Wallaby's was contractually required to allow the filing of a lien against the property.

{¶ 52} Accordingly, due to the lack of consideration for the new agreement, the trial court erred in applying the doctrine of accord and satisfaction. This would normally end the discussion, but Peh and Wallaby's contend that the doctrine of estoppel, raised in the answers and argued in the trial court, precludes recovery. *See, e.g.*, *Reynolds v. Budzik*, 134 Ohio App.3d 844, 846, fn.3, 732 N.E.2d 485 (6th Dist. 1999) (noting that "when a trial court has stated an erroneous basis for its judgment, an appellate court must affirm the judgment if it is legally correct on other grounds, that is, it achieves the right result for the wrong reason, because such an error is not prejudicial.")

{¶ 53} "Equitable estoppel precludes a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good-faith reliance upon

that conduct. The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice." (Citations omitted.) *Hutchinson v. Wenzke*, 131 Ohio App.3d 613, 616, 723 N.E.2d 176 (2d Dist.1999).

"A prima facie case for equitable estoppel requires a plaintiff to prove four elements: (1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) [that it induced] actual reliance which is reasonable and in good faith; and (4) [that the reliance caused] detriment to the relying party." *Id.*, quoting *Doe v. Blue Cross/Blue Shield of Ohio,* 79 Ohio App.3d 369, 379, 607 N.E.2d 492 (10th Dist. 1992).

In assessing these four elements in the context of a particular case, relevant factors include: (a) the nature of the representation; (b) whether the representation was in fact misleading; (c) the relative knowledge and experience of the parties; (d) whether the representation was made with the intent that it be relied upon; and (e) the reasonableness and good faith of the reliance, given all the facts and circumstances. *First Federal Sav. & Loan Assn. of Toledo v. Perry's Landing, Inc.*, 11 Ohio App.3d 135, 145-146, 463 N.E.2d 636 (6th Dist. 1983).

**{¶ 54}** In the case before us, Reid represented to Peh that the lease agreement entitled her to a mortgage on the real property, but that was an accurate fact, not a misrepresentation. Peh has also failed to point to any other specific misrepresentation, and the trial court did not find any. In fact, the trial court observed that Reid had never agreed to release Peh as a surety. Thus, because Peh failed to establish facts satisfying the first ground for estoppel, we need not address the remaining factors.

{¶ 55} Based on the preceding discussion, we conclude that the trial court erred in applying accord and satisfaction, and that the evidence does not support a finding of estoppel against Reid.

{¶ 56} Reid's Second, Third, and Fourth Assignments of Error are sustained. This matter will be remanded for further proceedings, since the trial court failed to address issues like setoff and the recovery of interest. In this regard, we note that Reid did recover the collateral.

## IV.   Conclusion

{¶ 57} Reid's First, Second, Third, and Fourth Assignments of Error having been sustained, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.

. . . . . . . . . . . . .

GRADY, P.J., and FROELICH, J., concur.

Copies mailed to:

John D. Smith
Benjamin J. Helwig
Hon. John W. Kessler
    (Sitting for Judge Stephen Wolaver)